## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **MIRNA MICHEL JABBOUR and**<br>**NATIONAL DEFENSE COMMITTEE,** | ) )<br>) | |
| **Plaintiffs,** | ) ) | **Case No. 1:20-cv-00034** |
| **v.** | ) ) | |
| **JOHN H. MERRILL, in his official**<br>**capacity as Alabama Secretary of State,**<br>**MOBILE COUNTY BOARD OF**<br>**REGISTRARS, KYLE CALLAGHAN,**<br>**in his official capacity as a member of**<br>**the Mobile County Board of Registrars,**<br>**JUDY MOTLOW, in her official**<br>**capacity as a member of the Mobile**<br>**County Board of Registrars, and RON**<br>**REAMS, in his official capacity as a**<br>**member of the Mobile County Board**<br>**of Registrars,** | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) | |

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
## AND MEMORANDUM IN SUPPORT[1]

Plaintiffs Mirna Michel Jabbour and National Defense Committee ("NDC"), by and through their attorneys, and for the reasons set out below, respectfully move this Court for a preliminary injunction. Fed. R. Civ. P. 65(a).

---

[1] As noted in the motion, Plaintiffs request that the Court consolidate the hearing on the preliminary injunction with hearing on the merits. *See* Fed. R. Civ. P. 65(a)(2).

## INTRODUCTION

Plaintiffs' Motion for Preliminary Injunction ("Motion") seeks to protect the votes of those citizens who are bravely serving this country or who are residing overseas and are unable to vote in person in Alabama. Alabama's Instant Runoff Primary Election or Ranked Choice Voting scheme ("RCV Scheme") makes it difficult for these voters to vote and deprives these voters of effective votes. Such disenfranchisement should not be tolerated, especially when it affects those men and women who already have difficulty voting because they are far from the Country or deployed in service to the Country.

The RCV Scheme severely burdens the voting rights of military and overseas voters and is violative of the First Amendment's right to free speech and association and the Fourteenth Amendment's Due Process Clause. Specifically, Alabama's RCV Scheme deprives military and overseas voters of vital information during the crucial time preceding runoff elections. The RCV Scheme also hinders the rights of voters to have their votes counted in a reliable manner because it encourages non-monotonic elections. Additionally, Alabama's RCV Scheme is a complicated system with complicated ballots, which are proven to cause voter confusion. Lastly, the RCV Scheme regimes suffer from high rates of "ballot exhaustion," resulting in a high percentage of discarded ballots.

For these reasons, Plaintiffs respectfully request this Court grant their Motion for Preliminary Injunction in order to protect the voting rights of military and overseas voters.

## FACTS

Alabama voters who vote pursuant to the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") of 1986, 52 U. S. C. § 20301, *et seq*., are forced to vote through an RCV ballot during primaries in the state.  Ala. Code § 17-13-8.1, attached as Exhibit 1 to the Complaint

(Doc. 1-1). In its federal primary elections, Alabama utilizes runoff elections or "second primaries" if no candidate receives a majority of the vote. Ala. Code § 17-13-18. In the runoff election, the two candidates who receive the most votes in the primary face off against one another while the other candidates are removed from the ballot. *Id*. Alabama's runoff election system has clashed with UOCAVA's requirements, eventually culminating in the creation of the RCV Scheme at issue here.

Under Alabama's RCV Scheme, military and overseas voters are given an RCV ballot for non-presidential federal primary elections involving three or more candidates. Ala. Code § 17-13-8.1 (Doc. 1-1). The RCV ballots list all the candidates participating in the primary election. *Id*. Unlike traditional absentee ballots, Alabama's military and overseas voters are instructed to rank all candidates in order of preference. *Id*. The state then tabulates the candidate each voter ranked first and adds those votes to each candidate's primary total. *Id*. The voters' choices other than their first-choice preferences are not counted during the count or upon the conclusion of the primary election. *Id*. In the event of a runoff election, rather than sending UOCAVA voters an additional runoff ballot, the state tabulates the ranked preferences from the RCV primary ballot and distributes the votes accordingly:

> If a second primary election is necessary, the vote to be counted as cast by each voter shall be the highest designated choice of the voter of the two candidates participating in a contest. The total count of the votes received by each candidate shall be added to the count of votes produced for the candidates pursuant to Section 17-13-18.

Ala. Code § 17-13-8.1(c)(5)(b) (Doc. 1-1). RCV voters are not required to rank all the candidates on the ranked choice ballot, but, if they do not rank the entire slate of candidates, their preferences are only tabulated for the candidates they ranked. Ala. Code § 17-13-8.1(c)(2) (Doc. 1-1). If none of the candidates that the voter ranked advance to the primary, the voter's ranked choice ballot is

not counted in the runoff election. This is known as "ballot exhaustion" or "ballot fatigue." If a voter's ballot is exhausted, they are essentially denied a vote in the runoff election.

Alabama's RCV Scheme was born from the conflict between the timing of the state's runoff elections and UOCAVA's requirements. UOCAVA guarantees U.S. citizens who are active members of the Uniformed Services, the Merchant Marine, the commissioned corps of the Public Health Service and the National Oceanic and Atmospheric Administration, their eligible family members, and U.S. citizens residing outside the United States the right "to use absentee registration procedures and to vote by absentee ballot in general, special, primary, and runoff elections for Federal office." 52 U.S.C. § 20302(a)(1). UOCAVA was amended in 2009 by the Military and Overseas Voter Empowerment Act ("MOVE Act") to require that states transmit absentee ballots to UOCAVA voters at least 45 days before an election for federal office to provide voters sufficient time to receive, mark, and return absentee ballots. *Id*. § 20302(a)(8)(A).

Despite UOCAVA's mandate to provide overseas and military voters with ballots at least 45 days before elections, Alabama has been holding its runoff elections less than 45 days after its primary elections, meaning military and overseas voters cannot be sent runoff ballots in time. This is entirely a problem of the state's own making: Alabama has repeatedly shortened the time between its primary and runoff elections from nine weeks in 2013 to six weeks with the implementation of the RCV Scheme in 2015. Both this Court and the U.S. Court of Appeals for the Eleventh Circuit found that UOCAVA precluded Alabama from holding the runoff elections so close in time. *United States v. Alabama*, 857 F. Supp. 2d 1236 (M.D. Ala. 2012); *United States v. Alabama*, 778 F.3d 926 (11th Cir. Ala. 2015). In 2012, the United States Department of Justice ("DOJ") sued the state of Alabama and then-Secretary of State Beth Chapman for, *inter alia*, violations of UOCAVA's 45-day advance ballot transmission requirement. *See* Complaint, *United*

*States v. Alabama*, No. 2:12-cv-179 (filed Feb. 24, 2012) (ECF 1). Rather than simply set a reasonable time between its elections or extend the deadline for UOCAVA ballots—Alabama has now set the time between the primary election and the primary runoff election to just four weeks—Alabama elected to remedy its UOCAVA violations by creating an entirely new voting scheme just for military and overseas voters—the RCV ballot. *See* 2019 amendment Act No. 2019-318; Ala. Code § 17-13-18(b) (2019).

## **ARGUMENT**

In addition to seeking a declaration that Alabama's RCV Scheme violates the Constitution, Plaintiffs seek a preliminary injunction to prevent the Alabama Secretary of State, as well as his employees and agents, from administering the RCV Scheme. The decision to grant or deny a preliminary injunction "is within the sound discretion of the district court . . . ." *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002). A district court may grant a preliminary injunction if the moving party shows that:

> (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.

*Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (*en banc*). Although a "preliminary injunction is an extraordinary and drastic remedy," it nonetheless should be granted if "the movant 'clearly carries the burden of persuasion' as to the four prerequisites." *United States v. Jefferson Cty.*, 720 F.2d 1511, 1519 (11th Cir. 1983) (quoting *Canal Auth. v. Callaway*, 489 F.2d 567, 573 (11th Cir. 1974)). None of these elements are controlling; rather, this Court must consider the elements jointly, and a strong showing of one element may compensate for a weaker showing of another. *See Democratic Exec. Comm. v. Detzner*, 347 F. Supp. 3d 1017, 1029 (N.D. Fla. 2018),

*aff'd, Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312 (11th Cir. 2019); *Fla. Med. Ass'n, Inc. v. U.S. Dep't of Health, Educ., & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979).

## I.   PLAINTIFFS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.

Plaintiffs are substantially likely to succeed on the merits of their First and Fourteenth Amendment claims.

In *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992) the Supreme Court laid out a "flexible standard" to resolve constitutional challenges to state election laws. *Anderson*, 460 U.S. at 789. "A court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights . . . that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick*, 504 U.S. at 433-34 (citation and internal quotations omitted). Under this sliding scale, when a regulation subjects the right to vote to a "severe" restriction, the restriction "must be narrowly drawn to advance a state interest of compelling importance" to pass constitutional muster. *Norman v. Reed*, 502 U.S. 279, 280 (1992). Less severe burdens remain subject to balancing, but "[h]owever slight" the burden on the right to vote "may appear," "it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford v. Marion Cty. Election Bd.*, 128 S. Ct. 1610, 1616 (2008) (plurality) (quoting *Norman*, 502 U.S. at 288-89).

Additionally, when "the fairness of the official terms and procedures under which the election was conducted" is in question, federal intervention is appropriate under the Fourteenth

Amendment's Due Process Clause. *Duncan v. Poythress*, 657 F.2d 691, 703 (5th Cir. 1981).[2] The Due Process Clause prohibits state laws that deliberately "erode[] the democratic process" by abrogating the right to vote. *Id.*

Alabama's RCV Scheme violates the First Amendment's rights to free speech and association as well as the Fourteenth Amendment's Due Process Clause for three reasons. *First,* Alabama's RCV Scheme deprives military and overseas voters of information during the crucial time immediately preceding runoff elections, requiring instead that these voters cast ballots without the benefit of the additional information. *Second*, RCV hinders the rights of voters to have their votes counted in a reliable manner. Specifically, RCV creates a high risk of non-monotonic elections, which result in candidates receiving a benefit from voters ranking them *lower* or a disadvantage from voters ranking them *higher*. Additionally, the RCV ballots involve lengthy and complicated ballots that cause voter confusion. These complicated RCV ballots are the functional equivalent to a literacy test, although here the RCV ballot is akin to a test in complex matrix algebra. *Third*, Alabama's RCV Scheme violates the rights to free speech, association, and due process because RCV suffers from very high rates of "ballot exhaustion," which impedes many voters from participating in runoff elections.

### A.  <u>Alabama's RCV Scheme Imposes Substantial And Severe Burdens.</u>

Alabama's RCV Scheme compels a voter to associate with low-preference candidates prior to there being any necessity of doing so and prior to receiving critical speech and information about the runoff competitors where neither was the voter's first choice.

---

[2] All decision of the United States Court of Appeals for the Fifth Circuit issued before close of business on September 30, 1981 are binding precedent in the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*) (adopting the decisions of the 5th Circuit as of close of business on September 30, 1981, as binding precedent in the Eleventh Circuit).

The First Amendment protects both the freedom of expression and the freedom of association because "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." *Buckley v. Valeo*, 424 U.S. 1, 15 (1976). This means that individuals have a right to associate with the candidate and political party of their choosing. *Tashjian v. Republican Party*, 479 U.S. 208, 214 (1986). But the Constitution prohibits the government from compelling voters to take positions with which they disagree or find morally repugnant. *See id.* at 216 n.7.

Prohibited too are statutes that impose earlier filing deadlines on minor parties where the deadlines are so early that information about candidates is low, thus preventing the minor party candidates from responding to newly released information from major party candidates later in the campaign season. *See Anderson*, 460 U.S. at 791-92. As the Supreme Court recognized, voters who are dissatisfied with the major party candidates will typically not gravitate to the minor party candidates until the policies of the major party candidates are announced. *Id.* at 791. Only once these voters have the information about the major party candidates will they then decide, often close in time to the election, to associate with third parties. *Id.* at 791-92. Importantly, the early filing statute imposed on minor party candidates failed "to satisfy the voting and associational interests of voters whose independent political leanings crystallized as a result of developments in the course of the primary campaigns." *Id.* at 791 n.12. Accordingly, the Supreme Court declared this state statute's earlier filing deadline for minor party candidates unconstitutional. *Id.* at 806.

       1. **Alabama's RCV Scheme Imposes A Severe Burden On Plaintiffs' First Amendment Rights to Free Speech and Association and Fourteenth Amendment Right to Due Process.**

It is of the utmost necessity in our democratic system that voters be free to obtain information so that they can appropriately associate with the candidate of their choice. *See Citizens*

*United v. FEC*, 558 U.S. 310, 341 (2010) ("[I]t is inherent in the nature of the political process that voters must be free to obtain information from diverse sources in order to determine how to cast their votes."). Denying voters, in this case overseas and military voters, information, namely that crucial information between the primary elections and runoff elections, constitutes a severe and discriminatory burden. Alabama can justify this burden only if the means are narrowly tailored to satisfy a compelling interest. *See Burdick*, 504 U.S. at 434.

*First*, Alabama's RCV Scheme denies certain voters crucial information that can only be obtained in the time between the primary election and the runoff. This alone is a severe burden. *See Citizens United*, 558 U.S. at 334 (recognizing that the most important election information comes in the weeks immediately preceding an election); *id*. at 341 (recognizing that the ability to obtain information to make informed choices in an election is necessary to the political process). Denying access to information in the weeks preceding the runoff election imposes a severe burden on these certain voters. *Anderson*, 460 U.S. at 791-92, 806; *cf. Kohler v. Tugwell*, 292 F. Supp. 978, 982 (E.D. La. 1968) (three-judge court) (stating that "the state may not mislead its voters to the extent that they do not know what they are voting for or against."), *aff'd. mem.,* 393 U.S. 531 (1969); *Smith v. Cherry*, 489 F.2d 1098, 1100, 1102 (7th Cir. 1973) (finding a complaint sufficiently pleaded civil rights violation where political party officials deceived voters—denied access to full information—in putting forth a candidate who, upon election, was immediately replaced by party officials and had voters known this, they would have voted for a different candidate).

*Second*, through non-monotonic elections, complex and confusing ballots, and ballot exhaustion, RCV voters, in this case military and overseas voters, are disenfranchised and denied an effective vote in runoff elections. *See Fla. Democratic Party v. Detzner*, No. 16-cv-607, 2016

U.S. Dist. LEXIS 143620 at \*20 (N.D. Fla. Oct. 16, 2016) ("If disenfranchising thousands of eligible voters does not amount to a severe burden on the right to vote, then this Court is at a loss as to what does.").

### B. The RCV Scheme Deprives Voters Of Vital Information During The Time Between The Primary Election And The Runoff Election.

Voters, like Plaintiffs, must cast one ballot for two elections. During the time between the primary and the runoff, voters associate with various candidates and are exposed to more information about those candidates. *See, e.g., Anderson*, 460 U.S. at 791-92. *See also* Jabbour Decl. at 9, attached as Exhibit 2 to the Complaint (Doc. 1-2). In particular, voters are exposed to information about the relative differences between the candidates on issues that may be important to voters at the time of the runoff but were less important during the primary election, when neither was the voter's first choice. As the Supreme Court has recognized:

> It is well known that the public begins to concentrate on elections only in the weeks immediately before they are held. There are short timeframes in which speech can have influence. The need or relevance of the speech will often first be apparent at this stage in the campaign. The decision to speak is made in the heat of political campaigns, when speakers react to messages conveyed by others.

*Citizens United*, 558 U.S. 310, 334 (2010).

Social science literature and experience support this observation. This system requires voters "[t]o make the choice from a larger candidate field[;] they will have to do so without the clarifying information and benefits of a run-off campaign, which often consist of campaigns working to present stark contrasts between the remaining two candidates." Jason McDaniel, *Does More Choice Lead to Reduced Racially Polarized Voting? Assessing the Impact of Ranked-Choice Voting in Mayoral Elections*, 10 Cal. J. Politics and Policy 2, 4 (2018), https://escholarship.org/uc/item/2gm5854x.

The importance of these intervening weeks on voter behavior is demonstrated by both campaigns' spending behavior and voter participation based on that expenditure.

> Generally, when more money is spent during the runoff, voter participation declines less relative to the initial primary, suggesting that a more stimulated political environment encourages greater participation. Spending before the initial primary is less influential than spending between the primary and runoff in maintaining voter turnout, which indicates that any potential effects from stimulation of the environment in the prior campaign have largely dissipated by the time of the second election.

Charles S. Bullock III, *et al.*, S*ystem Structure, Campaign Stimuli, and Voter Falloff in Runoff Primaries*, The Journal of Politics, Vol. 64, No. 4, 1210 (Nov. 2002). This has been born out in the real-world examples where turnout increased from primaries to primary runoffs in Alabama[3] and Mississippi,[4] and in general runoffs.[5]

When analyzing a similar RCV regime, the Ninth Circuit recognized the problem and criticized San Francisco's RCV regime because the regime did not "allow[] voters to *reconsider* their choices after seeing which candidates have a chance of winning. In other words, voters must submit their preferences . . . even though they might have chosen differently with more specific

---

[3] *See, e.g.*, 2017 U.S. Senate Special election primary and primary runoff in Alabama. (*compare* https://www.sos.alabama.gov/sites/default/files/election-2017/Alabama%20Republican%20Party%20-%20Certified%20Results%20and%20Nomination%20of%20Candidates%20for%20Primary%20Runoff%20-%202017-08-25.pdf *with* https://www.sos.alabama.gov/sites/default/files/voter-pdfs/2017/repPartyCert-ROResultsGenCand-USSenate-10-10-2017.pdf).

[4] *See, e.g.*, 2014 U.S. Senate primary and primary runoff in Mississippi. *See also* Elaine C. Kamarck, *Increasing Turnout in Congressional Primaries*, Center for Effective Public Management at Brookings (July 2014), https://www.brookings.edu/wp-content/uploads/2016/06/KamarckIncreasing-Turnout-in-Congressional-Primaries72614.pdf.

[5] *See, e.g.*, 2019 Gubernatorial elections in Louisiana. (*compare* https://electionstatistics.sos.la.gov/Data/Post_Election_Statistics/Statewide/2019_1012_sta.pdf *with* https://electionstatistics.sos.la.gov/Data/Post_Election_Statistics/Statewide/2019_1116_sta.pdf).

information about other voters' selections, they are not provided an opportunity to revise their choices." *Dudum v. Arntz*, 640 F.3d 1098, 1105 (9th Cir. 2011) (emphasis in the original).[6]

In many ways, requiring *ex ante* decisions well in advance of a hypothetical runoff is like imposing a blackout period on RCV voters where they are deprived of political speech and information at the very time that it becomes most important and pertinent to a discreet and potentially unanticipated choice in the runoff.

## C. Alabama's RCV Scheme Violates The First Amendment and Fourteenth Amendment Rights To Cast An Effective Ballot.

### 1. The RCV Scheme Creates Non-Monotonic Elections.

Non-monotonicity or monotonicity failure occurs when a winner of an election would have lost the election if he or she were ranked higher by a certain subset of voters, or when the loser of an election would have won if he or she was ranked lower by a certain subset of voters. *See* G. Scott Edwards, *Empowering Shareholders, or Overburdening Companies? Analyzing the Potential Use of Instant Runoff Voting in Corporate Elections*, 68 Van. L. Rev. 1335, 1361-63 (2019); Alexander Holtzman, *The Unanticipated Inequalities of Electoral Reform: Racial and Ethnic Disparities in Voting Behavior under Oakland's Ranked Choice Voting Program*, Political Science Honors Thesis, Professor Clayton Nall, Stanford University (May 4, 2012) at n. 7, *available                                                                                                              at* http://www.hawaiifreepress.com/Portals/0/Article%20Attachments/Racial%20and%20Ethnic%2 0Disparities%20in%20RCV.pdf?ver=2012-06-25-163017-030; Adam Crepeau and Liam Sigaud,

---

[6] The Ninth Circuit did not address the constitutionality of this issue because the parties did not raise it. *Dudum v. Arntz*, 640 F.3d 1098, 1106-07 (9th Cir. 2011) ("We have already explained some of the structural limitations inherent in restricted IRV. For instance, voters are unable to reconsider their choices after seeing which candidates have a chance of winning, and some voters might be unfamiliar with the system. *Dudum* does not, however, challenge those inherent features of the City's IRV system.").

*A False Majority: The Failed Experiment of Ranked-Choice Voting*, 20-23, The Maine Heritage Policy Center (Aug. 2019). The risk of monotonicity failure is inherent in every ranked choice voting scheme and occurs in Alabama's RCV Scheme.

Perhaps the clearest way to explain RCV and the inherent risk of monotonicity failure is through a real-life example. In the 2010 mayoral election for the city of Burlington, Vermont, Progressive candidate Bob Kiss won the election with ranked choice voting. After ranked choice voting eliminated several other candidates, the final three candidates were:

Bob Kiss (P)

Kurt Wright (R)

Andy Montroll (D)

After the first round of balloting, the number of voters ranking candidates first looked like this:

Wright (R): 3,297

Kiss (P): 2,982

Montroll (D): 2,554

Because only the top two candidates advance in the run-off portion of balloting, Montroll was eliminated.[7] Once this occurred, Kiss won the election with 51% of the vote.[8] How did this occur? Particularly because when given the choice between Montroll and Kiss, 54% preferred Montroll and when given the choice between Wright and Montroll, 56% preferred Montroll.[9]

---

[7] Joseph T. Ornstein and Robert Z. Norman, *Frequency of monotonicity failure under Instant Runoff Voting: estimates based on a spatial model of elections.* Public Choice 161:1-9 at 2 (2014).
[8] *Id*.
[9] *See id*; *see also* Anthony Gierzynski, *et al., Burlington Vermont 2009 IRV Mayor Election: Thwarted-majority, Non-monotonicity & Other Failures (oops)*, RangeVoting (March 2009), https://www.rangevoting.org/Burlington.html (last visited Jan. 18, 2020).

Kiss won because, ironically, not enough people ranked him first. By a substantial margin, those who voted for Wright preferred Montroll to Kiss by a 3:1 margin.[10] Bizarrely, if 750 people who ranked Wright first, Montroll second, and Kiss third had reversed their ranking, *i.e.*, Kiss first, Montroll, second, and Wright third, then Montroll would have beaten Kiss, despite 750 more people ranking Kiss first.[11] This process of making the candidate who is preferred by fewer voters into the winner cannot be permitted in our constitutional republic. Yet it occurs in the majority of competitive rank choice voting elections. *See* Barber Decl. at 12-13, attached as Exhibit 4 to the Complaint (Doc. 1-4).

### 2.  The RCV Scheme Creates Voter Confusion.

The RCV Scheme disenfranchises voters because its complication rises to such a level as to confuse voters. *See* Jabbour Decl. at 10-12 (Doc. 1-2), Carey Decl. at 9, attached as Exhibit 3 to the Complaint (Doc. 1-3). In a plurality election, the choice facing voters is simple: of all the candidates on the ballot, whom do you prefer? Ranked choice voting is much more complicated, and much more different from the voting methods voters have been used to using in the past. Ranked choice elections require substantially more information than plurality elections, and most voters do not possess the necessary information to complete the ranked choice ballot correctly. Indeed, the complexity of RCV and the requirement to make head-to-head comparisons of every possible permutation of candidates in order to determine ranking most resembles forbidden literacy tests, or perhaps here, matrix algebra tests.

The complexity inherent in RCV systems leads to a number of severe burdens on voters. Under RCV, greater numbers of ballots are spoiled or "exhausted" due to over voting or

---

[10] *See* Ornstein and Norman, *supra* note 8 at 2 (table 1); *see also* Gierzynski, *et al.*, *supra* note 10.
[11] Ornstein and Norman, *supra* note 8 at 3.

unintentional under voting, where a voter may mistakenly fail to utilize some of his or her voting power. *See* Crepeau and Sigaud, *supra* 16 at 6-8; Edwards, *supra* 15 at 1366-64. Both under votes and over votes on ballots are considered exhausted because the votes are not counted at all. The effect is similar to not even casting a ballot on Election Day. *See* Crepeau and Sigaud, *supra* 16 at 2. RCV's complexity also leads to reduced voter turnout even for the initial election, not unlike other arbitrary or discriminatory barriers to entry such as literacy tests or poll taxes. *See generally Id*.

### 3. The Constitution Prohibits Statutes That Deprive Voters Of The Ability To Vote For The Candidate Of Their Choice.

The First and Fourteenth Amendments to the U.S. Constitution protect the right to vote and to have that vote properly counted. "[A]ll qualified voters have a constitutionally protected right to vote . . . and to have their votes counted." *Reynolds v. Sims*, 377 U.S. 533, 554 (1964). The right to vote "can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Id*. at 555. At its most foundational, the right to vote includes the right to "vote freely for the candidate of one's *choice*." *Id.* (emphasis added).

Accordingly, because the right to vote cannot be debased or diluted by racial gerrymandering, *see, e.g., Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 797 (2017), or by violations of the one person, one vote principle, *see, e.g., Wesberry v. Sanders*, 376 U.S. 1, 7-8 (1964), the right to vote includes the right to have one's vote properly counted. *See, e.g., Curling v. Raffensperger*, 397 F. Supp. 3d 1334, 1404 (N.D. Ga. 2019) (holding that plaintiffs were likely to succeed on the merits of their claim that certain voting systems violated their First Amendment rights because the systems did not reliably count the votes); *see also id*. at 1404 ("All of the precedents indicate that having one's vote properly counted is fundamental to the franchise.")

15

(quoting favorably *Stewart v. Blackwell,* 444 F.3d 843, 868 (6th Cir. 2006), *vacated as moot,* 473 F.3d 692 (2007).

When a vote is not reliably counted, "[d]ue process, representing a profound attitude of fairness between man and man, and more particularly between individual and government, is implicated in such a situation." *Curling,* 397 F. Supp. 3d at 1404 (quoting *Duncan,* 657 F.2d at 703). The rights protected under the Due Process Clause of the Fourteenth Amendment extend not just to the initial allocation of the right to vote, but also to the manner of exercising the right to vote. *See Bush v. Gore*, 531 U.S. 98, 104-05 (2000). "Just as the equal protection clause of the fourteenth amendment prohibits state officials from improperly diluting the right to vote, the due process clause of the fourteenth amendment forbids state officials from unlawfully eliminating that fundamental right." *Duncan,* 657 F.2d at 704. "It is well established that when a state accords arbitrary . . . treatment to voters, those voters are deprived of their constitutional right[] to due process . . . ." *Curling,* 397 F. Supp. 3d at 1404 (citing *Bush v. Gore*, 531 U.S. at 107).

In *Curling*, one of the plaintiffs alleged that the voting machine had "repeatedly changed her vote to candidates she did not choose." *Id*. at 1384. A different plaintiff alleged that when she cast her ballot for the Democratic candidate, she noticed that the selection "immediately jumped to the Republican." *Id*. Another plaintiff alleged that when she voted for Stacy Abrams, the machine, on three occasions, changed her selection to Brian Kemp. *Id*. Other plaintiffs experienced similar problems that involved whether their vote was actually cast and counted accurately. *Id*. at 1382-92.

In analyzing these facts, the court noted that under binding precedent, the Fourteenth Amendment's Due Process Clause prohibits laws that unlawfully eliminate a constitutional right. *Id*. at 1401 (citing *Duncan*, 657 F.2d at 704 (5th Cir. 1981). This includes cases where the court is

presented with an election system that is fundamentally flawed. *Id*. at 1404 (quoting *Duncan*, 657 F.2d at 703). Accordingly, the court held that the voting system not only burdened plaintiffs' right to vote, but in fact deprived plaintiffs "of their rights to cast secure votes that are reliably counted." *Id*. at 1402. This was because the voting systems machines posed a "concrete risk of alteration of the ballot counts." *Id*. at 1401. Accordingly, the burden was severe.

Here, as the example of Burlington, Vermont demonstrates, *supra* at 13-14, the votes of military and overseas voters are not reliably counted. The constitution guarantees voters the right to vote for the candidate of their choice and to have their vote properly counted. *See Reynolds*, 377 U.S. at 555; *Curling*, 397 F. Supp. 3d 1334, 1404. But in Vermont, the winner of the election won, bizarrely, because not enough voters ranked him first. Had more voters ranked him first, the winner would have lost. RCV does not reliably count votes and does not accurately reflect voters' choices and preferences.

The election in Burlington, Vermont is not an outlier. According to studies in simulated elections, the problem of non-monotonicity, the very problem exhibited in Burlington, Vermont, is exhibited in 15% to 51% of competitive elections. *See* Barber Decl. at 12-13 (Doc. 1-4). Accordingly, there is a substantial risk that an RCV voter's vote for the candidate of their choice is not being counted in a reliable manner. This is a severe burden that deprives voters of a fundamental right to have their vote properly counted. *See Reynolds,* 377 U.S. at 555; *Curling*, 397 F. Supp. at 1402, 1404.

> **4. RCV's Inherently High Rates of Ballot Exhaustion Violate The First Amendment Rights to Free Speech And Association and The Fourteenth Amendment Right to Due Process.**

Alabama's RCV Scheme, by exhausting a high percentage of ballots, severely burdens the right to vote, which "is of the most fundamental significance under our constitutional structure." *Burdick*, 504 U.S. at 433 (citation omitted).

Ballot exhaustion occurs where voters' ballots are discarded either because of over votes or unintentional under votes, where a voter may mistakenly fail to utilize some of his or her voting power. *See* Crepeau and Sigaud, *supra* 16 at 6-8; G. Scott Edwards, *supra* 15 at 1366-64. Both under votes and over votes on ballots are considered exhausted because the votes are not counted at all. The effect is similar to not even casting a ballot on Election Day. *See* Crepeau and Sigaud, *supra* 16 at 2. Ballot exhaustion also leads to reduced voter turnout even for the initial election, not unlike other arbitrary or discriminatory barriers to entry such as literacy tests or poll taxes. Barber Decl. at 9-10 (Compl. Ex. 4).

The problem of ballot exhaustion is real and substantial. Studies have shown that in RCV elections, anywhere from approximately 10% to over 27% of all RCV votes are exhausted prior to the runoff election. *See* Barber Decl. at 9-10 (Compl. Ex. 4); Craig M. Burnett and Vladimir Kogan, *Ballot (and Voter) "Exhaustion" Under Instant Runoff Voting: An Examination of Four Ranked-Choice Elections*, 37 Electoral Studies 41, 46 (2015) https://www.sciencedirect.com/science/article/pii/S0261379414001395.[12] This means that in some elections, over a quarter of all those who submitted ranked choice ballots had no say whatsoever in the final round of vote redistribution deciding the election outcome. *Id*. In fact, after examining 96 ranked-choice voting races across the nation, one study found that an average of

---

[12] *See also* Cook, *et al.*, *Ranked Choice Voting in the 2011 San Francisco Municipal Election: Final Report*, McCarthy Center Faculty Publications (2011), http://repository.usfca.edu/mccarthy_fac/2.

10.92% of all RCV ballots cast were exhausted by the final round of tabulation. *See* Crepeau and Sigaud, *supra* 16 at 20-23.

In fact, RCV races can and have created more exhausted ballots than ballots actually awarded to the winner of an election. *See Id*. at 9-10 ("the 2010 election for San Francisco's Board of Supervisors in District 10 resulted in 9,608 exhausted ballots whereas the prevailing candidate only received 4,321 votes.") (citing Official Ranked-Choice Results Report November 2, 2010 Consolidated Statewide Direct Primary Election Board of Supervisors, District 10, City of San Francisco (2011), https://sfelections.org/results/20101102/data/d10.html). This problem occurs primarily because voters do not fill out a ballot completely by ranking all candidates. Burnett and Kogan, *supra* 23 at 46. There are many reasons why a voter might rank less than all the candidates on their ballot, including lack of information about the large number of candidates, confusion about how ranked-choice voting works, or because of voters' concerns over non-monotonicity. *See Id*. at 46; Crepeau and Sigaud, *supra* 16 at 20-23. Moreover, studies indicate that ballot exhaustion occurs even in elections where voters have been using RCV for many elections, which indicates that even a substantial amount of public education about the process is unlikely to eliminate the phenomenon. Burnett and Kogan, *supra* 23 at 47. Effectively, Alabama has imposed a literacy test on voters, except rather than a literacy test, voters must demonstrate an understanding of complex matrix algebra to competently cast one ballot for two elections.

The ballot exhaustion rate in RCV elections is so high in fact that many winning candidates do not even win with a true majority of the total votes cast—which is the very reason for runoff elections. *Id*.; Barber Decl. at 9-10 (Compl. Ex. 4). Additionally, studies that have focused on the effects of ballot exhaustion within minority and elderly communities have found that the effects are exacerbated. *See* Holtzman, *supra* 12; Francis Neely and Jason McDaniel, *Overvoting and the*

*Equality of Voice Under Instant-Runoff Voting in San Francisco*, California Journal of Politics and Policy 7(4) (2015).

### 5. Alabama's RCV Scheme Imposes A Severe Burden On Fundamental Rights.

"Obviously included" within the right to vote "is the right of qualified voters within a state to cast their ballots and have them counted." *United States v. Classic*, 313 U.S. 299, 315 (1941); *Stewart v. Blackwell*, 444 F.3d 843, 856-57 (6th Cir. 2006) (same). *See also* 52 U.S.C. § 10310(c)(1) (defining right to vote as including "casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast").

The discarding of potentially thousands of military and overseas ballots, based on the votes of a previous election, unquestionably imposes a severe burden on the constitutional right to vote. *See Fla. Democratic Party v. Detzner*, No. 16-cv-607, 2016 U.S. Dist. LEXIS 143620 at *20 (N.D. Fla. Oct. 16, 2016) ("If disenfranchising thousands of eligible voters does not amount to a severe burden on the right to vote, then this Court is at a loss as to what does."). In the context of voting rights cases, "Even one disenfranchised voter—let alone several thousand—is too many[.]" *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014), *cert. denied*, 135 S. Ct. 1735 (2015). For example, in *Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580 (6th Cir. 2012), the court held that disqualification of thousands of Ohio provisional ballots because they were cast in the right polling location but wrong precinct in multiple precinct polling locations constituted a "substantial" burden on provisional voters. *Id*. at 597. The court reached this conclusion even though such ballots historically constituted less than 0.248% of all votes cast. *Id*. at 593. *See also Cherry*, 489 F.2d at 1100, 1102 (where a candidate conspired with political party officials to run as a "stand-in" candidate during a primary but had no intention of running in the general election, and then dropped out after the primary to make way for a candidate

supported by the party officials, voters who voted for the stand-in candidate believing they were voting for the party's nominee for the general election suffered an "impermissible" "abridgment of the[ir] right to vote").

Here, ballot exhaustion is a real and substantial phenomenon. Between 10 and 27% of RCV ballots are discarded and not counted in the runoff elections. Even at 10%, this means a substantial percentage of UOCAVA votes in Alabama's elections are discarded. This is a far cry from the 0.248% of ballots discarded in *Husted. Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d at 593. Alabama has therefore imposed a substantial and severe burden on the overseas and military voters where at least 10% of their ballots are not counted in the runoff election. It is as though they never cast a ballot, and thus is a severe burden.

### D. <u>Alabama Cannot Justify Imposing Its Severe and Substantial Burdens on Voters.</u>

Because Alabama imposes severe and substantial burdens on voters, in this case military and overseas voters, Alabama must justify the imposition of these burdens with a sufficiently important interest and demonstrate that it uses means that are narrowly tailored. *Burdick*, 504 U.S. at 434. Even if Alabama did somehow have a compelling interest to justify the severe burdens placed on voters, which it does not, the means are not at all narrowly tailored. Much simpler and less constitutionally burdensome alternatives exist that would accomplish the state's asserted interests in complying with UOCAVA. Accordingly, Alabama cannot justify the imposition of its burdensome RCV Scheme. *Norman*, 502 U.S. at 290 (stating that "the State Supreme Court's inhospitable reading of § 10-5 sweeps broader than necessary to advance electoral order and accordingly violates the First Amendment right of political association[]" because there were less intrusive means available); *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 813 (2000);

*McCutcheon v. FEC,* 572 U.S. 185, 221-22 (2014) (discussing less restrictive alternatives to federal aggregate contribution limits).

The legislative and litigation history show that Alabama's RCV Scheme was enacted to address both UOCAVA's requirement that ballots be transmitted to overseas and military voters 45 days before an election and the state's deliberate decision to have the runoff election only mere weeks after the primary. *See United States v. Alabama,* 778 F.3d 926, 941 (11th Cir. 2015). But Alabama could satisfy UOCAVA's requirements by either extending the time between the primary and runoff elections or, alternatively, by permitting UOCAVA voters to return traditional ballots for runoff elections.[13] In fact, during the course of the litigation that gave rise to the RCV Scheme, the State clearly and unequivocally stated as much in briefing. In State Defendants' Unopposed Response To Order Re: Judgment Concerning Proposed Remedy, *United States v. Alabama,* No. 2:12-cv-00179 (filed Feb. 24, 2012) (Doc. 122), Alabama stated:

> If this Court intends to enter injunctive relief to ensure that runoff ballots are sent to UOCAVA voters at least 45 days before a runoff election, there are three general choices, each with disadvantages: (1) *The Court could move the date of the federal runoff election to provide more time for ballot transmission*; (2) it could authorize the use of election tools, such as ranked ballots (also known as an "instant runoff"), that would permit UOCAVA voters to receive ballots more than 45 days before a runoff election using the current schedule; or (3) it could declare that Alabama not use runoffs for federal elections and that a plurality of votes would henceforth be sufficient to win a primary.

> It has been Alabama's policy, embodied in statute by the Alabama Legislature, that if no candidate receives a majority vote in a primary election, then the two candidates receiving the most votes will face off in a "second primary," or runoff, election. Ala. Code § 17-13-18. *Thus, moving the date of the federal runoff (option 1 above) is arguably the most respectful of the State's policy choices.*

---

[13] If this Court orders the remedy of permitting more time to receive ballots from military and overseas voters, Alabama would be eligible for a hardship exemption under the UOCAVA statute. 52 U.S.C. § 20302(g)(2)(B)(i).

*Id.* at 3 (emphasis added). However, the State only argued against such a remedy at that stage because it desired to have the same dates for federal runoff and state runoffs which was not possible at that time due to the nature of the litigation. *Id.* at 3-4. Specifically, Alabama argued that the court did not have remedial jurisdiction over state elections because it was a UOCAVA claim which only applied to federal elections and the legislature did not have sufficient time to synchronize the state runoff dates to new federal runoff dates if new federal runoff dates were ordered by the court. *Id.* Accordingly, Alabama conceded that:

> If . . . the date of federal runoff elections were moved beginning in 2016, then the Alabama Legislature would have time to synchronize state and federal runoffs, or to make its own policy choices if it prefers a different remedy that is UOCAVA-compliant under the Court's reading of the statute. *Hence, moving the federal runoff election back* beginning in 2016 *is the preferred long-term solution for a judicial remedy.*

*Id.* at 4 (emphasis added). The State also argued that RCV "is too great a deviation from present policy choices for the State Defendants to suggest it as permanent relief . . . ." *Id.*

But, rather than follow its own advice and provide for legally sufficient time between the primary and runoff election, Alabama reversed course, shortened the time between the primary election and the runoff election, and implemented its current RCV Scheme that requires military and overseas voters to cast one ballot for two elections.

Alabama has doubled-down by shortening the time between its primary and runoff elections. Alabama has shortened the runoff period from nine weeks to six weeks with the implementation of the RCV Scheme for UOCAVA voters in 2015, and now to just four weeks with the implementation of a 2019 amendment. Act No. 2019-318. *See* Ala. Code § 17-13-18(b) (2019). In the end, the RCV Scheme was created to remedy a problem of Alabama's own making— its continual shortening of runoff periods. It has no "sufficiently weighty" interest, let alone a compelling one, in furthering the RCV Scheme.

23

Alabama has less constitutionally burdensome options available to it. It could move the runoff election from its current four weeks to at least eight weeks after the primary, or, in the alternative, apply for a UOCAVA hardship exemption and provide military and overseas voters more time to transmit their ballots. Therefore, Alabama cannot justify the burdens it imposes on voters. Alabama's RCV Scheme therefore fails constitutional scrutiny.

Accordingly, Plaintiffs have a substantial likelihood of succeeding on the merits of their First and Fourteenth Amendment claims, and this Court should grant their Motion for preliminary injunction.

## II.    PLAINTIFFS WILL SUFFER IRREPARABLE INJURY IN THE ABSENCE OF A PRELIMINARY INJUNCTION

Continued enforcement of Alabama's RCV Scheme threatens Plaintiffs and all other military and overseas voters in Alabama with irreparable harm.

An injury is irreparable "if it cannot be undone through monetary remedies." *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987). The Supreme Court has recognized that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The Eleventh Circuit has recognized the same. *Cate v. Oldham*, 707 F.2d 1176, 1188-89 (11th Cir. 1983); *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010); *Eternal Word TV Network, Inc. v. Sec'y, United States HHS*, 756 F.3d 1339, 1349-50 (11th Cir. 2014); *Taylor v. Ft. Lauderdale*, 810 F.2d 1551, 1554 (11th Cir. 1987).

Moreover, "a violation of the right to vote cannot be undone through monetary relief and, once the election results are tallied, the rejected electors will have been disenfranchised without a future opportunity to cast their votes." *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1340 (N.D. Ga. 2018). *See also Id*. (quoting *League of Women Voters of N.C.*, 769 F.3d at 247) ("Courts routinely

deem restrictions on fundamental voting rights irreparable injury."); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("A restriction on the fundamental right to vote therefore constitutes irreparable injury."). This makes sense as the right to vote is "a fundamental political right, because [it] is preservative of all rights . . ." *Reynolds*, 377 U.S. at 562 (internal citations omitted).

Here, given their high likelihood of disenfranchisement, Plaintiffs and the military and overseas voters similarly situated to them will suffer irreparable harm if Alabama's RCV Scheme is not enjoined. As has occurred in previous elections, these voters' voting rights will be burdened by the structural problems inherent in the RCV Scheme, RCV ballots will not be counted due to voter confusion resulting in undervoting and overvoting, and these voters will be compelled to associate with certain candidates lest they risk having their ballots exhausted. The harms imposed by the RCV Scheme are irreparable because they both threaten constitutional injury, cannot be "undone" through monetary compensation, and, indeed, cannot be undone at all after a runoff election has taken place.

Accordingly, Plaintiffs, and the military and overseas voters similarly situated to them, will undeniably suffer irreparable injury if this Court does not grant an injunction. This factor therefore weighs heavily in Plaintiffs' favor.

## III.    PLAINTIFFS' INJURY FAR OUTWEIGHS ANY SLIGHT BURDEN TO THE STATE

The threatened injury of voter disenfranchisement far outweighs any slight inconvenience that an injunction might cause the State. Alabama's primary election is approximately three months away, permitting plenty of time for the Secretary to comply with UOCAVA and send plurality ballots to military and overseas voters. If a runoff election is required, that election would not be slated for another month after that—approximately three months from the filing of this brief.

This allows for plenty of time to extend the deadline for UOCAVA runoff ballots, or to craft some other remedy this court deems necessary. Of course, if a runoff election is not necessary after the upcoming primary election, there will be absolutely no additional inconvenience on the Secretary whatsoever.

The State has already conceded in prior litigation that moving the date of the runoff election is not only possible, but actually "the most respectful of the State's policy choices" and "is the preferred long-term solution for a judicial remedy." State Defendants' Unopposed Response To Order Re: Judgment Concerning Proposed Remedy, *United States v. Alabama*, No. 2:12-cv-00179 at 3-4 (filed Feb. 24, 2012) (Doc. 122). *See supra* at 22-23.

Any hardship that might be created by an injunction would thus be minimal or even nonexistent and is certainly outweighed by the hardship imposed by the unconstitutional deprivation of the right to vote. *See Taylor v. Louisiana*, 419 U.S. 522, 535 (1975) (stating "administrative convenience" cannot justify the deprivation of a constitutional right). Accordingly, this factor also weighs heavily in Plaintiffs' favor.

## IV.    THE GRANT OF THIS PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST

The public has a paramount interest in elections where every eligible citizen may cast an effective vote. *See Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005); *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (The public has a "strong interest in exercising the fundamental political right to vote." (citations omitted)); *League of Women Voters of N.C.*, 769 F.3d at 247-48; *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d at 1327. "That interest is best served by favoring enfranchisement and ensuring that qualified voters' exercise of their right to vote is successful." *Obama for America v. Husted*, 697 F.3d at 437 (quoting *Hunter v. Hamilton*

*County Bd. of Elections*, 635 F.3d 219, 244 (6th Cir. 2011). "The public interest therefore favors permitting as many qualified voters to vote as possible." *Id*. at 437.

"[E]nforcement of an unconstitutional law is always contrary to the public interest." *Pursuing Am.'s Greatness v. F.E.C.*, 831 F.3d 500, 511 (D.C. Cir. 2016) (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)); *see also League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action."). There is in fact a "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Newby*, 838 F.3d at 12. Because "it may be assumed that the Constitution is the ultimate expression of the public interest," *Gordon*, 721 F.3d at 653 (quotation marks omitted), the public interest is served by ensuring that defendant does not irrevocably offend that document while this case is being litigated.

Consequently, the public interest here favors issuance of a preliminary injunction for reasons similar to those discussed with respect to the other preliminary injunction factors. The public interest clearly lies with permitting eligible military and overseas voters effective votes, rather than unconstitutionally disenfranchising them. Alabama's RCV Scheme deprives UOCAVA voters of this right and thereby unconstitutionally disenfranchises them. Preventing the continuation of such an unconstitutional law is clearly in the public interest. Accordingly, this factor weighs heavily in Plaintiffs' favor.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant Plaintiffs' Motion for Preliminary Injunction and direct the Secretary to suspend his implementation of the RCV Scheme.

Respectfully submitted January 21, 2020

/s/ Matthew R. Jackson
Matthew R. Jackson (JACKM7882)
C. Britton Bonner (BONNC0122)
ADAMS AND REESE LLP
11 N. Water Street, Suite 23200
Mobile, Alabama 36602
(251) 433-3234 (Phone)
(251) 438-7733 (Fax)
britton.bonner@arlaw.com
matt.jackson@arlaw.com
*Counsel for Plaintiffs*

Jason B. Torchinsky*
Jonathan P. Lienhard*
Shawn Sheehy*
Dennis W. Polio*
HOLTZMAN VOGEL JOSEFIAK TORCHINSKY, PLLC
45 North Hill Drive, Suite 100
Warrenton, VA 20186
(540) 341-8808 (Phone)
(540) 341-8809 (Fax)
Jtorchinsky@hvjt.law
Jlienhard@hvjt.law
Ssheehy@hvjt.law
Dwpolio@hvjt.law
*pro hac vice* application to be filed
*Counsel for Plaintiffs*

Erik S. Jaffe*
SCHAERR-JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
 (202) 787-1060 (Phone)
ejaffe@schaerr-jaffe.com
*pro hac vice* application to be filed
*Counsel for Plaintiffs*