IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA

MIRNA MICHEL JABBOUR, and )
NATIONAL DEFENSE COMMITTEE, )
)
  Plaintiffs, )
)
 v. )  Case No. 1:20-cv-00034-JB-N
)
JOHN H. MERRILL, in his official capacity )
as Secretary of State, MOBILE COUNTY )
BOARD OF REGISTRARS, KYLE )
CALLAGHAN, in his official capacity as a )
member of the Mobile County Board of Registrars, )
JUDY MOTLOW, in her official capacity as a )
member of the Mobile County Board of Registrars, )
and RON REAMS, in his official capacity as a )
member of the Mobile County Board of Registrars, )
)
  Defendants. )

**STATE DEFENDANTS' MOTION TO DISMISS**

Steve Marshall
 *Attorney General*

Winfield J. Sinclair (ASB-1750-S81W)
Misty S. Fairbanks Messick (ASB-1813-T71F)
*Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Post Office Box 300152
Montgomery, Alabama 36130-0152
telephone: 334.353.8674
facsimile: 334.353.8400
Winfield.Sinclair@AlabamaAG.gov
Misty.Messick@AlabamaAG.gov

***Counsel for the State Defendants***

TABLE OF CONTENTS

STATE DEFENDANTS' MOTION TO DISMISS ............................................................. 1

I.    INTRODUCTION ............................................................................................... 1

II.   FACTUAL BACKGROUND .................................................................................. 2

      A.  Primary Runoff Elections ...................................................................... 2

      B.  *UOCAVA I* .............................................................................................. 2

      C.  *UOCAVA II* ............................................................................................. 3

      D.  *UOCAVA III:* Scope of the New 45-Day Rule ...................................... 3

      E.  *UOCAVA III:* Remedy Proceedings ...................................................... 4

      F.  Ala. Act No. 2015-518 ........................................................................... 7

III.  STANDARD OF REVIEW ..................................................................................... 8

IV.   THIS COURT LACKS SUBJECT MATTER JURISDICTION ..................................... 9

      A.  The Plaintiffs lack standing; and, even if they had standing to sue someone, they would lack standing to sue the Mobile County Board of Registrars and its Members ................................................................................................ 9

            1. Plaintiff Jabbour lacks standing ................................................. 10

            2. Plaintiff National Defense Committee lacks standing .............. 11

            3. The Mobile County Board of Registrars and its Members did not cause, and cannot redress, any injury Plaintiffs have suffered and thus Plaintiffs lack standing to bring claims against them ....................................... 12

      B.  The Mobile County Board of Registrars has sovereign immunity, and so do the Board Members ........................................................................................ 14

            1. The Mobile County Board of Registrars has sovereign immunity ........... 14

            2. The Members of the Mobile County Board of Registrars also have sovereign immunity ....................................................................... 18

**V.**    PLAINTIFFS' CLAIMS ARE MERITLESS. ..........................................................................18

    A.  Plaintiffs' claim that Alabama's use of ranked choice ballots violates their First Amendment rights is meritless because any burden is slight and fully justified by the State's weighty interests....................................................................................20

    B.  Plaintiffs' claim that ranked choice voting schemes risk non-monotonicity is meritless because Plaintiffs have failed to challenge the specific system in place in Alabama ....................................................................................................................24

    C.  Plaintiffs' claim that ranked choice voting leads to ballot exhaustion is due to be dismissed because Plaintiffs have failed to challenge the specific system in place in Alabama and because Plaintiffs are trying to advance the rights of non-parties ....................................................................................................................................28

**VI.**   CONCLUSION............................................................................................................30

**STATE DEFENDANTS' MOTION TO DISMISS**

Pursuant to Fed. R. Civ. P. 12(b)(1) and Fed. R. Civ. P. 12(b)(6), the State Defendants—Secretary of State John H. Merrill, the Board of Registrars for Mobile County, Board Chair Motlow, and Board Members Callaghan and Reams—move to dismiss for lack of subject matter jurisdiction and for failure to state a claim.

## I. INTRODUCTION

As with all human endeavors, no system of elections is perfect and preferred by everyone. *Cf. Dudum v. Arntz,* 640 F.3d 1098, 1100, 1103, 1117 (9th Cir. 2011) (acknowledging same). If a government chooses to accept a plurality vote and if there are more than two candidates, the winner may garner support well below 50%; that is, the winner may be someone whom the majority do not support. If a government instead requires a majority vote then, whenever there are more than two candidates, there is a need for either runoffs (which can, among other things, delay finality by weeks and increase costs while decreasing voter turnout) or some variation of ranked choice voting (which Plaintiffs attack here). The balancing of electoral interests is inherently a decision for the sovereign, and it falls to the States in the first instance, even for federal elections. *Clingman v. Beaver*, 544 U.S. 581, 586 (2005); *see also* U.S. Const. Art. I, § 4, cl. 1

Alabama has adopted a ranked choice ballot to serve UOCAVA voters[1] participating in Congressional elections while simultaneously protecting the interests of other voters and of candidates, all of whom are also impacted by how the State designs her election system. Plaintiffs ask this court to unilaterally upend Alabama's careful balancing of interests because they

---

[1] Voters protected by the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), as modified by the Military and Overseas Voter Empowerment Act (MOVE Act), 52 U.S.C. § 20301, *et seq. See* 52 U.S.C. § 20310 (definitions); *United States v. Alabama*, 778 F.3d 926, 929 n. 1 (11th Cir. 2015) (describing UOCAVA voters).

1

disapprove of ranked choice voting.  The court should instead dismiss.  As to jurisdiction, each Plaintiff lacks standing and four of the State Defendants are not sufficiently connected to the challenged law for Plaintiffs to establish standing.  Additionally, these State Defendants have sovereign immunity.  On the merits, two of Plaintiffs' three claims are directed at ranked choice voting schemes that may be in use in others jurisdictions, but are very different from the system Alabama has implemented.  Finally, any burden actually placed on Plaintiffs is minimal and is fully justified by the State's interest in complying with UOCAVA's 45-day rule, *see* 52 U.S.C. § 20302(a)(8), and in advancing the interests of all voters and of candidates by maintaining a single primary runoff election date on a non-extended schedule.

## II.  FACTUAL BACKGROUND

### A.  Primary Runoff Elections.

In  Alabama,  regularly-scheduled  federal,  State,  and  county  elections[2]  are  held simultaneously, and each starts with a primary election.  The primary is "an election held by qualified voters who are members of any political party for the purpose of nominating a candidate or candidates for public . . . office." Ala. Code § 17-13-1.  Primaries can only be won with a majority vote.  Ala. Code § 17-13-18(b); *cf. Dudum,* 640 F.3d at 1100 (describing one reaction to plurality voting as an "'extraordinary injustice'").  If no candidate receives a majority of the vote, a primary runoff (also known as a second primary election) is subsequently held between the top two vote getters.  Ala. Code § 17-13-18(b) & (c).

### B.  UOCAVA I.

In 2006, the United States sued the State and State officials charging that the three-week period between the June 6 primary election and the June 27 primary runoff election was

---

[2]      Unless otherwise specified, all references to elections exclude municipal elections.

insufficient to allow UOCAVA voters to participate in any primary runoff election under the then-current federal law. *United States v. Alabama (UOCAVA I)*, Case No. 2:06-cv-00225-MEF-CSC, doc. 1 (M.D. Ala. 2006), **Doc. 24-5, PageID.190-97**. The complaint alleged: "[T]he Federal Voting Assistance Program ('FVAP') of the Department of Defense and the United States Election Assistance Commission recommend that States allow 45 days for the round-trip transit of an overseas ballot. At a minimum, FVAP has determined that States must provide no less than 30 days for the round-trip transit of a ballot to overseas locations." **Doc. 24-5, PageID.192.**

Alabama responded by enacting Ala. Act No. 2006-354. **Doc. 24-6, PageID.198-217.** Pertinent here, it moved the primary runoff election to six weeks after the primary election, **Doc. 24-6, PageID.205-206,** and it accepted for counting UOCAVA ballots that were postmarked by the day of the primary runoff election and received by mail no later than noon seven days later, **Doc. 24-6, PageID.202, 204.** By contrast, everyone else's ballots had to be postmarked by the day prior to the election and received by noon on Election Day. **Doc. 24-6, PageID.200, 204.** The United States thereafter voluntarily dismissed. *UOCAVA I,* doc. 13, **Doc. 24-7, PageID.218-221.**

### C. UOCAVA II.

In 2008, the United States brought a second UOCAVA lawsuit. *United States v. Alabama (UOCAVA II)*, Case No. 2:08-cv-00920-WKW-CSC, doc. 1 (M.D. Ala. 2008). It concerned a reporting requirement for general elections, and is not relevant here. It was voluntarily dismissed after the two sovereigns were able to cooperatively resolve the matter. *UOCAVA II*, doc. 27.

### D. UOCAVA III: Scope of the New 45-Day Rule.

In 2012, when the United States sued the State and the Secretary of State over UOCAVA compliance again, the primary election was scheduled for the second Tuesday in March (namely March 13, 2012) and the primary runoff election was scheduled for six weeks later (April 24,

2012).  *United States v. Alabama (UOCAVA III)*, Case No. 2:12-cv-00179-MHT-WC, doc. 1 at ¶¶ 1, 10, 13 (M.D. Ala. 2012), **Doc. 24-8, PageID.222, 224**; Ala. Act No. 2011-566.

Pertinent here, UOCAVA had been amended by the MOVE Act, *see* n. 1, *supra*, and now required UOCAVA ballots to be transmitted no later than 45 days before the election, if they had been requested by that time and the State had not obtained a waiver.  **Doc. 24-8, PageID.223.** Alabama argued that the 45-day requirement did not apply to primary runoff elections, but the courts held otherwise.  *United States v. Alabama*, 998 F. Supp. 2d 1283 (M.D. Ala. 2014); *United States v. Alabama*, 778 F.3d 926 (11th Cir. 2015).[3]

On appeal, Alabama "raised an important policy consideration and made a plausible showing that [she] might face a problematic decrease in voter turnout if [she] schedules [her] runoff elections seven weeks after [her] primary elections," *Alabama*, 778 F.3d at 941, but the court determined "[u]ltimately, the very difficulty of these policy considerations, and Congress' superior institutional competence to pursue this debate, suggest that legislative not judicial solutions are preferable," *id.* (internal citation and quotation marks omitted).

### E.  *UOCAVA III:* Remedy Proceedings.

Meanwhile, proceedings had continued in the district court based on that court's determination that the 45-day requirement applied to Alabama's primary runoff elections.  The district court had invited the parties to brief the appropriate relief.  *Alabama*, 998 F. Supp. 2d at 1294.  The State responded:

> If this Court intends to enter injunctive relief to ensure that runoff ballots are sent to UOCAVA voters at least 45 days before a runoff election, there are three general choices, each with disadvantages: (1) The Court could move the date of the federal runoff election to provide more time for ballot transmission; (2) it could authorize the use of election tools, such as ranked ballots (also known as an "instant

---

[3]     While the appeal was pending, UOCAVA was moved within the United States Code from Title 42 to Title 52.

4

runoff"), that would permit UOCAVA voters to receive ballots more than 45 days before a runoff election using the current schedule; or (3) it could declare that Alabama not use runoffs for federal elections and that a plurality of votes would henceforth be sufficient to win a primary.

It has been Alabama's policy, embodied in statute by the Alabama Legislature, that if no candidate receives a majority vote in a primary election, then the two candidates receiving the most votes will face off in a "second primary," or runoff, election. Ala. Code § 17-13-18. Thus, moving the date of the federal runoff (option 1 above) is arguably the most respectful of the State's policy choices.

*UOCAVA III*, doc. 122 at 2-3, **Doc. 24-9, PageID.248-249.**

The State went on to explain, however, that moving the primary runoff election was not a practical solution in the near-term. **Doc. 24-9, PageID.249-250.** UOCAVA only concerns *federal* elections and thus the court had no authority to move the simultaneously-scheduled State and county runoff elections. **Doc. 24-9, PageID.249;** *see also* 52 U.S.C. § 20302. At that point, there was a possibility of a federal primary runoff election in the 2014 Republican race for Congressional District 6, and the State was concerned that moving the federal primary runoff election date would result in some voters being asking to turn out for the primary election and then two separate primary runoff elections. **Doc. 24-9, PageID.249-250.** "That scenario could have a negative impact on voter turnout, cause voter confusion, impact candidates who are presently planning for a shorter runoff period, and burden election officials. There would also be a significant cost associated with holding an additional election on a separate date." **Doc. 24-9, PageID.249-250.**

Accordingly, the State asked to be allowed to use ranked ballots for the sole 2014 federal election that might result in a runoff. **Doc. 24-9, PageID.250-251.** During the course of the litigation and with the federal court's authorization, *UOCAVA III*, docs. 69, 71, 72 & 74, the State had used ranked ballots for a 2013 special election to fill Congressman Jo Bonner's seat upon his resignation and found it had "work[ed] well" in achieving UOCAVA compliance on the State's

election schedule, **Doc. 24-9, PageID.250.**[4]   The court accepted the State's proposal as to the potential 2014 primary runoff.   *UOCAVA III*, doc. 127 at 3-8, **Doc. 24-10, PageID.256-261.**

Thus, the State used a form of ranked choice voting for a 2013 special election and would go on to use it for one election in 2014.   Both times, the State was able to do so only because federal court orders granted it authority to do so.   State law still provided for a traditional primary runoff election to be held six weeks after the primary election.   Thus, as to a permanent solution to be imposed by judicial fiat, the State asked that the court go no further in disrupting its chosen election system then moving the federal primary runoff election back.   **Doc. 24-9, PageID.249-250.**   In doing so, the State recognized that making that change effective in 2016 would allow the Alabama Legislature time to weigh in on which option it preferred:

> If, however, the date of federal runoff elections were moved beginning in 2016, then *the Alabama Legislature would have time to synchronize state and federal runoffs, or to make its own policy choices if it prefers a different remedy* that is UOCAVA-compliant under the Court's reading of the statute.   Hence, moving the federal runoff election back beginning in 2016 is the preferred long-term solution for a *judicial* remedy.

**Doc. 24-9, PageID.250** (emphasis added).   Thus, the State requested the judicial remedy that was most respectful of the State's prior choices, while recognizing that the Alabama Legislature should have the option to consider the best way for Alabama to comply with UOCAVA's 45-day requirement.   **Doc. 24-9, PageID.250.**   The district court accepted the proposal and ordered that, "beginning in the 2016 election cycle," "should a runoff election be necessary for any federal office, said runoff election shall occur on the 63rd day following the State's primary elections." **Doc. 24-10, PageID.261**.

---

[4]     The procedures employed in the Bonner special election were not the same as the ones currently in place.   *See UOCAVA III*, doc. 69 (motion), 71 (order), 72 (notice concerning lack of Democratic primary runoff potential), 74 (order on amended procedure).

**F.   Ala. Act No. 2015-518.**

In 2015, Secretary of State Merrill "led the charge to find a solution that does not require holding any federal runoff election on a different date than the State and county runoff elections will be held.  In so doing, he . . . worked with members of the Alabama Legislature and with the Governor's Office to ascertain which potential solution is most politically palatable to the State." *UOCAVA III*, doc. 153 at 5, **Doc. 24-11, PageID.268.**   The result was "ranked ballots" that "allow UOCAVA voters to rank the candidates in order of preference with the top-ranked candidate receiving the vote in the primary and the highest-ranked candidate to reach the runoff election receiving the vote in that election."  **Doc. 24-11, PageID.268-269;** *see also* Ala. Act No. 2015-518, **Doc. 24-12, PageID.278-285.**  All other voters would continue voting as they had.  **Doc. 24-11, PageID.268-269.**  The State moved the *UOCAVA III* court for relief from its orders requiring any federal primary runoff election to be nine weeks (63 days) after the primary election.  **Doc. 24-11, PageID.264-277.**

The motion noted that the State Defendants had previously "recognized that there were different solutions for the problem at hand and chose the one that seemed most appropriate to be imposed during the course of litigation.  In so doing, they specifically recognized the possibility that the State Legislature might choose a different solution.  Now, the new Secretary of State, the Legislature, and the Governor ha[d] united behind ranked ballots for UOCAVA voters, with the federal runoff elections returning to the date on which State and county runoff elections will be held."  **Doc. 24-11, PageID.271** (internal citations omitted).  The motion also explained that four other States use ranked ballots for UOCAVA voters.  **Doc. 24-11, PageID.272-274.**  The court authorized the implementation of Ala. Act No. 2015-518's use of ranked ballots to achieve UOCAVA compliance for any federal primary runoff election.  *UOCAVA III*, doc. 164, **Doc. 24-**

**13, PageID.286-289.**   The Secretary of State developed regulations to implement the new law, and those were filed with the court as well.  *See e.g., UOCAVA III*, doc. 179 (State's Notice of Filing Final Regulations).[5]

Before this year, the ranked ballots authorized by Ala. Act No. 2015-518 were used for four Republican elections, half of which were decided without a primary runoff election.  Decl. of Ed Packard, **Doc. 24-2, PageID.173-174.**   Ranked ballots are currently in use for the 2020 Republican primary for United States Senate and in Congressional Districts 1 and 2 for the United States House of Representatives, as well as for the Democratic primary election in Congressional District 1.  **Doc. 24-2, PageID.173-174.**  As of the afternoon of February 13, 2020, approximately 500 UOCAVA ballots had been sent for the 2020 elections.[6]  **Doc. 24-2, PageID.174.**  As of that same day, Alabama had more than 3.5 million registered voters.  **Doc. 24-2, PageID.174.**

### III.  STANDARD OF REVIEW

The State Defendants assert both facial and factual challenges to the court's subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1).  "A factual attack challenges the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered. A facial attack, on the other hand, challenges the complaint on its face and asks whether the complaint sufficiently allege[s] a basis of subject matter jurisdiction, employing a standard similar to that governing Rule 12(b)(6) review."  *Alabama v. PCI Gaming Authority,* 15 F. Supp. 3d 1161, 1165 (M.D. Ala. 2014) (internal citations and quotation marks omitted).

---

[5]     The regulations have been amended.   The current regulations are filed at **Doc. 24-14, PageID.303-309** and discussed below.

[6]     Not all of these ballots are ranked choice ballots as discussed below and in the Declaration of Ed Packard, **Doc. 24-2, PageID.173-174.**

The State Defendants also assert failure to state a claim under Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court must "take the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff." *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). This rule "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Additionally, notwithstanding the alleged facts, Rule 12(b)(6) [d]ismissal is . . . permitted when[,] on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *Thompson v. Alabama*, 293 F. Supp. 3d. 1313, 1317 (M.D. Ala. 2017) (internal citations and quotation marks omitted; first two alterations by the court).

## IV. THIS COURT LACKS SUBJECT MATTER JURISDICTION.

### A. The Plaintiffs lack standing; and, even if they had standing to sue someone, they would lack standing to sue the Mobile County Board of Registrars and its Members.

"In limiting the judicial power to Cases and Controversies, Article III of the Constitution restricts it to the traditional role of Anglo–American courts, which is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law. Except when necessary in the execution of that function, courts have no charter to review and revise legislative and executive action. This limitation is founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Summers v. Earth Island Inst.*, 555 U.S. 488, 492-93 (2009) (internal citations and quotation marks removed). Plaintiffs "bear[] the burden" of demonstrating standing "for each type of relief sought." *Id.* at 493. Without standing, there is no subject matter jurisdiction. *City of Miami Gardens v. Wells Fargo & Co.*, 931 F.3d 1274, 1282 (11th Cir. 2019).

Standing requires "First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *City of Miami Gardens*, 931 F.3d at 1282 (internal citations and quotation marks omitted).

**1. Plaintiff Jabbour lacks standing.**

Plaintiff Jabbour complains that there are multiple ways that casting a ranked choice ballot will injure her. **Doc. 1, PageID.4-5.** One problem with those allegations is that, while she did request an absentee ballot, **Doc. 1, PageID.4,** she did not designate a political party preference when she did so, Decl. of Ed Packard, **Doc. 24-2, PageID.177-178**.[7] As a result, she is not participating in either the Democratic or Republican primary elections, where candidates will be ranked, **Doc. 24-2, PageID.175-177, 179-180, 183-184.** Instead, she received a non-partisan ballot which allows her to offer a simple Yes or No vote on a single proposed Constitutional Amendment. *See* **Doc. 24-2, PageID.177-178, 185.** The Secretary of State's office transmitted a data file to the electronic ballot vendor that indicated Plaintiff Jabbour should be sent the nonpartisan ballot, and did so on January 17, 2020, **Doc. 24-2, PageID.177-178,** which is days before this lawsuit was filed, **Doc. 1, PageID.1.** Thus, as a factual matter, none of the harms she alleges in the complaint can occur.

---

[7]     A standard Application for Absentee Ballot and a UOCAVA Application for Absentee Ballot are available at https://www.sos.alabama.gov/alabama-votes/voter/absentee-voting, and they are filed as **Doc. 24-3, PageID.186-187** and **Doc. 24-4, PageID.188-189**, respectively.

Standing "requires federal courts to satisfy themselves that the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant [*her*] invocation of federal-court jurisdiction." *Summers,* 555 U.S. at 493.  "A plaintiff has injury in fact if [she] suffered an invasion of a legally protected interest that is concrete, particularized, and actual or imminent.  A concrete injury must be *de facto*; that is, it must actually exist."  *Nicklaw v. CitiMortgage, Inc.*, 839 F.3d 998, 1002 (11th Cir. 2016) (internal citations and quotation marks omitted).  The "requirement [of standing] assures that there is a real need to exercise the power of judicial review in order to protect the interests of the complaining party.  Where that need does not exist, allowing courts to oversee legislative or executive action would significantly alter the allocation of power . . . away from a democratic form of government."  *Summers*, 555 U.S. at 493 (internal citations and quotation marks omitted; ellipsis by the court).  Plaintiff Jabbour has no actual injury, and, thus, no standing.  Her claims should be dismissed.

### 2.  Plaintiff National Defense Committee lacks standing.

The National Defense Committee is trying to assert the rights of the military voters it serves, rather than to redress any injury that it has itself suffered.  **Doc. 1, PageID.2, 5-6, 22; Doc. 1-3, PageID.33-34.**  Under these circumstances, it must first allege (and later prove) that "its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (*citing Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).  The problem for NDC is that it never alleges that it has members at all, *see* **Doc. 1, PageID.1-23; Doc. 1-3, PageID.32-34,** and thus fails to allege standing.

11

It is plain that NDC cares very much about the members of the United States Armed Forces—as does Alabama—and it alleges that it represents members of the military through activities like testimony and education.  *See* **Doc. 1, PageID.1-23; Doc. 1-3, PageID.32-34.** However, "standing on behalf of the group served by the organization" has "never [been] recognized by any court." *Ne. Ohio Coal. for Homeless & Serv. Emp. Intern. Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1010 n. 4 (6th Cir. 2006).   Rather, to allege associational standing under *Hunt*, the NDC was required to allege first that it has members who have standing, and it has not done that, *see* **Doc. 1, PageID.1-23; Doc. 1-3, PageID.32-34.**    Instead, NDC says it represents members *of the military* through its activities.   **Doc. 1, PageID.2, 5-6; Doc. 1-3, PageID.33-34.**  Thus, NDC has not alleged that it has standing to bring the claims in the complaint, and the NDC's claims should be dismissed.

### 3. The Mobile County Board of Registrars and its Members did not cause, and cannot redress, any injury Plaintiffs have suffered and thus Plaintiffs lack standing to bring claims against them.

Even if the Plaintiffs had standing to sue someone, they would not have standing to sue the Board of Registrars and its Members.  The Boards of Registrars exist to pass on applications for voter registration, *see e.g.,* Ala. Code §§ 17-3-1, 17-3-2, 17-3-11, 17-3-52, and to otherwise maintain the voter rolls, *see e.g.,* Ala. Code §§ 17-3-54, 17-4-3 through 17-4-13, 17-4-30, 17-4-36, 17-4-39.  *See also* Board of Registrars Handbook (Handbook), **Doc. 24-15, PageID.314-319.** They are also involved in determining whether provisional ballots should be counted, Ala. Code § 17-10-2; *see also* **Doc. 24-15, PageID.327-329,** and in issuing free photo voter ID cards, *see* Ala. Code § 17-9-30(g); **Doc. 24-15, PageID.320-323.**  They have no significant role in the absentee voting process.  When Judge Thompson entered an order concerning ranked ballots for a potential Congressional primary runoff election in 2014, the Boards were mentioned with respect

to registering voters in advance of the election and recording voter history in the voter registration system after the election.  **Doc. 24-10, PageID.258-259;** *see also* Ala. Code § 17-4-39 (voter history).  No duty was identified with respect to the ranked choice ballots themselves or with respect to administering the absentee balloting process. **Doc. 24-10, PageID.256-260.** And Plaintiffs themselves have not identified any such duties.

Plaintiffs allege injuries based on Alabama's limited use of ranked choice ballots to enable UOCAVA voters to participate in the State's Congressional primary runoff elections.  **Doc. 1, PageID.1-23.**  The complaint alleges that the Board "is a public entity that, among other things, provides for the administration of voting and voting registration in Mobile County, Alabama," **Doc. 1, PageID.6,**  and that is has Members, **Doc. 1, PageID.6,** but does not connect either to Plaintiffs' alleged injuries or an ability to provide relief, **Doc. 1, PageID.1-23.**

The Board of Registrars (and its Members) are not responsible for every election-related experience a voter has after registration. *Lujan v. Defendants of Wildlife*, 504 U.S. 555, 560 (1992) ("[T]here must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . the[e] result []of] the independent actions of some third party not before the court.'") (*quoting Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 41-42 (1976)) (alterations by the court, except the first).  And, because they do not bear responsibility with respect to administering the absentee balloting process generally or the ranked choice ballots specifically, they cannot provide the Plaintiffs relief.  *Cf. Lujan*, 504 U.S. at 561 ("Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'") (*quoting Simon*, 426 U.S. at 38).  Plaintiffs have failed to satisfy the second and third elements of standing with respect to the Board of Registrars and its Members, and these State Defendants should be dismissed.

13

**B. The Mobile County Board of Registrars has sovereign immunity, and so do the Board Members.**

**1. The Mobile County Board of Registrars has sovereign immunity.**

Plaintiffs have named the Mobile County Board of Registrars itself as a defendant. **Doc. 1, PageID.1, 6.** However, the Board contends that it is an "arm of the [S]tate" "shield[ed]" by Eleventh Amendment immunity, *McAdams v. Jefferson County 911 Emergency Commc'n. Dist.*, 931 F.3d 1132, 1135 (11th Cir. 2019) (*per curiam*).  The Supreme Court of Alabama long ago concluded that "Without question, the program of registration of electors and the whole election system in the [S]tate as planned by the Constitution is the exercise of a [S]tate function." *Garner v. McCall*, 235 Ala. 187, 178 So. 210 (1938).  While that decision was prior to a 1996 revision of Alabama's Suffrage and Elections Article, another federal court has relied on *Garner* and on *Mitchell v. Wright*, 69 F. Supp. 698,702 (M.D. Ala. 1947) ("The members of the Boards of Registrars of the different counties of Alabama are State Officers."), to find that the Registrars are State officials. *United States v. Alabama*, Case No. 2:06-cv-392-WKW, 2006 WL 1598839 (M.D. Ala. June 7, 2006).  Subsequently, the Alabama Attorney General's office has also opined that Registrars are State officials and the "[B]oard of [R]egistrars is a [S]tate board."  Opinion to Hon. Thomas L. White, Jr., State Comptroller, dated August 17, 2011 (corrected Dec. 8, 2011), A.G. No. 2011-089, **Doc. 24-16, PageID.434-435.**

To the extent there is any question, the court "balance[s] four factors to determine whether an entity acts as an 'arm of the state' entitled to sovereign immunity: '(1) how [S]tate law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity.'" *McAdams v. Jefferson County 911 Emergency Commc'n. Dist.*, 931 F.3d 1132, 1135 (11th Cir. 2019) (*per curiam*) (*quoting Manders v. Lee,* 338 F.3d 1304, 1309 (11th Cir. 2003)).

The Alabama Constitution provides that "The Legislature shall by law provide for the registration of voters, absentee voting, secrecy in voting, the administration of elections, and the nomination of candidates." Ala. Const. art. VIII, § 177(c). The Legislature has done that through a combination of State and county employees. Pertinent here, the Secretary of State, who is a constitutional officer in the State's executive branch, Ala. Const. art. V, § 112, "is the chief elections official in the [S]tate and shall provide uniform guidance for election activities," Ala. Code § 17-1-3(a). Boards of Registrars exist in each of Alabama's 67 counties to act on voter registration applications and otherwise maintain the voter rolls. *See e.g.,* Ala. Code §§ 17-3-1, 17-3-2(a), 17-4-3, 17-4-7, & 17-4-39. While each Board operates within its own county, Ala. Code § 17-3-2, the Board Members are contributing to the "nondiscriminatory, single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered by the Secretary of State, with advice from [others], which contains the name and registration information of every legally registered voter in the [S]tate," Ala. Code § 17-4-33(a). "[T]o establish the statewide voter file and to ensure its continued accuracy," it is the duty of the Board Members to provide delineated information to the Secretary. Ala. Code § 17-4-36. "All voter registration, voter identification, and the purging of voters from the voter roll" is to "be done pursuant to" State law. Ala. Code § 17-4-37.

The Board Members are generally "appointed . . . by the Governor, Auditor, and Commissioner of Agriculture and Industries, or by a majority of them acting as a [S]tate board of appointment." Ala. Code § 17-3-2; *see also* Ala. Code § 17-3-4 (filling vacancies). The Board Members "may be removed for cause by the Secretary of State," Ala. Code § 17-3-3, and the Secretary employs a Supervisor of Voter Registration who, among other things, "serve[s] as a liaison between the Secretary of State and the county boards of registrars on implementation of

existing and future laws pertaining to voter registration," Ala. Code § 17-4-35(2), and "train[s], counsel[s], advise[s], and evaluate[s] registrars in the performance of their lawful functions," Ala. Code § 17-4-35(13).

The Secretary publishes a Board of Registrars Handbook, **Doc. 24-15, PageID.310-432,** that includes information on how the Board Members are to do their jobs. The Secretary sets the content of the voter registration form, Ala. Code § 17-3-52, and "furnish[es] to each [B]oard of [R]egistrars the necessary forms and supplies for effectuating the purposes of" Chapter 3 of Title 17, Ala. Code § 17-3-57, which is entitled Voter Registration.

Board Members "take the same oath as required by the judicial officers of the [S]tate," Ala. Code § 17-3-6, and when an appeal of a denial of voter registration is taken, the District Attorney defends on behalf of the State, Ala. Code § 17-3-55. The State determines by statute how many days the Board Members may work, and the answer varies by county. Ala. Code § 17-3-8.

With respect to finances, the State pays a salary which it provides to the county commission to then distribute to the Board Members. Ala. Code § 17-3-5(a); *see also* Ala. Code § 17-3-12. The State covers "the employer share of the Social Security or Federal Insurance Corporation Act tax," *id.*, and, generally speaking, the county initially pays for "[t]ravel and other expenses," but is reimbursed by the State, *id.* The county can choose to pay the Board Members additional salary out of its own funds. Ala. Code § 17-3-13(a). The Board Members are declared State employees for some purposes, Ala. Code § 17-3-5(c), and to "be treated as equals with other [S]tate and county employees" or with county employees, for other purposes, Ala. Code § 17-3-5(d)-(f).

The county provides the office space for the Board, Ala. Code § 17-3-60, and the county is "authorized and directed to expend county funds for supplies, equipment, telephone services, office space, and clerical help as may be necessary," Ala. Code § 17-3-10; *see also* Ala. Code

§ 17-3-60.[8]  On the other hand, the Secretary of State provides the forms and supplies necessary for voter registration, Ala. Code § 17-3-57, "and the expense incurred thereby shall be paid by the [S]tate," *id*.  The State also reimburses the counties "for all postage costs associated with voter lists maintenance activities provided for in Section 17-4-30 and one-fourth of the cost of the publication of the names of persons to be removed from the list of registered voters as required in Section 17-4-10."  Ala. Code § 17-4-31.

All in all, voter registration is a State function.  The Alabama Attorney General has recognized the Board as a State agency, and a federal court has recognized the Board Members are State officials.  The State exercises control over the functions of the Board, and pays many, but not all, of its operational costs.  The Boards operate within each county in order to be close to the voters.  It is entirely reasonable for each county to make arrangements for their offices, telephones, *etc.*, while State law provides how the Boards are to perform their duties and the Secretary provides training and guidance on these matters.  The Board Members are not employees of the Secretary and the Secretary does not have "control" over them, Opinion to Hon. Lesley Vance, Member, House of Representatives, dated July 1, 2004, A.G. No. 2004-171[9], but neither does anyone else; they are separately appointed State officials.  And, while we are unaware of it occurring at any time in the recent past, if a monetary judgment were entered against the Board, we would expect, for the reasons discussed above, that the State would pay it, if it were related to voter registration.  Accordingly, this court should find that the Board is shielded by sovereign immunity.

---

[8]  While it is inconceivable that the Board of Registrars would be a State office in some counties and a county office in others, the State Defendants do acknowledge that the Mobile County Board of Registrars has clerical staff.

[9]  This Opinion says that the Registrars are generally not considered State employees, but it is superseded by the Opinion to Hon. Thomas L. White, Jr., State Comptroller, dated August 17, 2011 (corrected Dec. 8, 2011), A.G. No. 2011-089, **Doc. 24-16, PageID.434-435.**

## 2. The Members of the Mobile County Board of Registrars also have sovereign immunity.

"[T]he Eleventh Amendment prohibits suits against [S]tate officials where the [S]tate is, in fact, the real party in interest." *Summit Med. Assoc., P.C. v. Pryor*, 180 F.3d 1326, 1336 (11th Cir. 1999). *Ex parte Young*, 209 U.S. 123 (1908), allows litigation against State officials to nonetheless proceed for prospective, injunctive relief to end violations of federal law. *Summit Med. Assoc., P.C.*, 180 F.3d at 1336-37. The *Ex parte Young* exception to sovereign immunity does not apply where the defendant "has no authority to enforce the challenged statute." *Summit Med. Assoc., P.C.*, 180 F.3d at 1341-42. The inquiry into whether a defendant has a sufficient "connection to the enforcement of the challenged law" "is largely the same as the one that governs standing." *Greater Birmingham Ministries v. Alabama*, 2017 WL 782776, at *13 (N.D Ala. 2017) (internal citations and quotation marks omitted). As discussed above, Plaintiffs lack standing as to both the Board and the Board Members because these State Defendants did not cause and cannot remedy any injury the Plaintiffs have. Because they have no connection to the enforcement of the ranked choice ballot statute, the Board's sovereign immunity also shields the Board Members.

## V. PLAINTIFFS' CLAIMS ARE MERITLESS.

"[V]oting is of the most fundamental significance under our constitutional structure." *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979). Nonetheless, "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974). Thus, it is no surprise that "the States have evolved comprehensive, and in many respects complex, election codes regulating in most substantial ways, with respect to both federal and state elections, the time, place, and manner of holding primary and general elections . . . ." *Id.*

Faced with a constitutional challenge to a State's election laws, the courts turn to the *Anderson-Burdick* test, named after *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992). *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318 (11th Cir. 2019). As described by the Eleventh Circuit Court of Appeals last year:

> That test requires [the court] to weigh the character and magnitude of the asserted First and Fourteenth Amendment injury against the [S]tate's proffered justifications for the burdens imposed by the rule, taking into consideration the extent to which those justifications require the burden to plaintiffs' rights. A law that severely burdens the right to vote must be narrowly drawn to serve a compelling [S]tate interest. And even when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden. The more a challenged law burdens the right to vote, the stricter the scrutiny to which we subject that law.

*Democratic Exec. Comm. of Fla.*, 915 F.3d at 1318-19 (internal citations and paragraph break omitted). "Lesser burdens, however, trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (internal citations and quotation marks omitted).

The court should not have cause to apply the *Anderson-Burdick* test beyond Count I because the other Counts fail to grapple with the way that Alabama uses ranked choice voting, which undermines the claims as a factual matter. To the extent that the *Anderson-Burdick* test is at play, as to each of the Counts, Alabama has imposed a minimal burden (if any burden at all) and that burden is fully justified by the State's interest in complying with UOCAVA's 45-day rule while protecting the interests of all voters and candidates and maintaining a single primary runoff election date on a non-extended schedule. Eliminating primary runoff elections entirely (even if only for Congressional offices) would run the risk of the party nominee having little support. Maintaining primary runoff elections but separating the federal election from the State and county

19

election would cost money and burden election officials.  It could also impact voter turnout, as voters are asked to come to the polls on yet another day.  And, moving all the primary runoff elections to nine weeks after the primary election comes with its own costs for candidates and the possibility of reduced voter turnout. [10]  As to costs, Plaintiffs cite Dr. Charles Bullock for the proposition that candidates must spend money between the primary election and the primary runoff election to maintain voter interest and turnout.  **Doc. 1, PageID.14-15.**  It stands to reason that a longer schedule between those two elections means more money must be spent to maintain voter interest and turnout, and that is obviously harder on less well funded campaigns, *e.g.,* campaigns for county offices. *Cf.* **Doc. 25-1, PageID.455.**  As to turnout, Plaintiffs' expert, Professor Barber, acknowledges that "runoffs held too long after the first primary" "attract less turnout." **Doc. 1-4, PageId.52.**  Alabama has an interest in protecting all of these interests and balancing them appropriately to design an election system that creates nominees with majority support and does so with a single primary runoff election on a non-extended schedule while maintaining compliance with UOCAVA's 45-day rule.

### A. Plaintiffs' claim that Alabama's use of ranked choice ballots violates their First Amendment rights is meritless because any burden is slight and fully justified by the State's weighty interests.

Count I alleges that the Plaintiffs are deprived of their First Amendment rights when Alabama has designed her voting system to enable them to vote in the primary election and the primary runoff election simultaneously because doing so means that they will miss out on information that may (or may not) emerge before the primary runoff election occurs at the polls

---

[10]    Because UOCAVA's 45-day rule requires that UOCAVA ballots be transmitted no later than 45 days before the Congressional election when they have been requested by then, 52 U.S.C. § 20302(a)(8), Plaintiffs' suggestion that Alabama can further extend the return timeline for UOCAVA voters, *see e.g.,* **Doc. 1, PageID.22,** does nothing to keep Alabama in compliance with the 45-day rule.

(if one is needed).  Plaintiffs specifically do not bring an Equal Protection challenge, **Doc. 1, PageID.13-16,** and even rely on a journal article that considered ranked choice voting as replacing, not existing alongside, a runoff election, **Doc. 1, PageID.14**—and that seems to be the topic their expert addresses as well, **Doc. 1-4, PageID.51-52.**  Along the way, Plaintiffs invoke entirely inapposite cases. **Doc. 1, PageID.14-16.**

Starting with the cases, the quotes from *Citizens United v. FEC*, 558 U.S. 310 (2010), are accurate but not helpful. It was in the course of explaining why the court would reach a facial challenge to 2 U.S.C. § 441b that the court explained Citizens United needed to know it could speak two years earlier, while the election it was trying to influence was still on-going.  *Citizens United*, 558 U.S. at 334.  And while the court said that "It is well known that the public begins to concentrate on elections only in the weeks immediately before they are held," *id.*, it is also well known that this is because voters are making their choices as they prepare to cast their votes. Nothing prohibits UOCAVA voters from paying attention sooner than other voters.  Moreover, given that we are concerned here only with Congressional elections, and we are living in the age of the internet and social media, there is no reason to believe that UOCAVA voters will confront a lack of available information when they are ready to pay attention.[11]

The second quote from *Citizens United* on which the Plaintiffs rely, **Doc. 1, PageID.14,** concerned silencing speakers based on viewpoint, *Citizens United*, 558 U.S. at 341, and has no application here.  Alabama is not silencing anyone.  What Plaintiffs are asserting, through this

---

[11]     Indeed, every candidate who might have been on Plaintiff Jabbour's ballot if she were participating in a political party's primary, *see* **Doc. 24-2, PageID.175-176, 179-180,** has a presence on the internet, *see e.g.,* JamesAverhart.com; RickCollinsCampaign.com; KianiGardener.com; StanleyAdairforSenate.com; BradleyByrne.com; ArnoldMooney.com; RoyMoore.org; RuthforALSenate on Facebook; JeffSessions.com; TommyforSenate.com; JerryCarlforCongress.com; CastoraniforCongress.com; BillHightower.com; WesLambertforCongress; and, PringleforCongress.com.

citation and through their reference to Jason McDaniel's article, **Doc. 1, PageID.14,** and their own

expert report, **Doc. 1-4, PageID.51-52,** is that it is useful to extend elections in case interesting

facts develop.  They have no more First Amendment right to demand that the State hold a primary

runoff election than they to do demand all the elections be held as late as possible, in order that all

potentially interesting events and communications have time to occur.  Alabama is not required by

the First Amendment to wait for the fullest development of all potential facts.  And, indeed,

Alabama has in recent years moved its primary election date—even separating the presidential

preference primary election from the other elections before rejoining them—in an effort to get to

the front of the line, where it expected to have more impact on the election.  *Compare* Ala. Act

No. 2006-354, **Doc. 24-6, PageID.205** (June primary) *with* Ala. Act No. 2006-634 (moving

presidential preference primary to February); Ala. Act No. 2011-566 (moving the presidential

preference primary to March); Ala. Act No. 2015-239 (re-joining the primary and the presidential

preference primary in March).[12]

Plaintiffs' citations to *Kohler v. Tugwell*, 292 F.Supp. 978 (E.D. La. 1968) (three-judge

district court), and *Smith v. Cherry*, 489 F. 2d 1098 (7th Cir. 1973) (*per curiam*), are likewise

beside the point.  In *Kohler*, the question was whether Louisiana voters had been misled by the

ballot language summarizing a proposed constitutional amendment.  *Kohler*, 292 F.Supp. at 979.

The court did say that it "accept[ed] the plaintiffs' premise that the [S]tate may not mislead its

---

[12]     Plaintiffs' reliance on Dr. Bullock, **Doc. 1, Page ID.14-15,** is also beside the point.  The
quote goes to the need for candidates to work hard and spend money to keep voters energized to
go to the polls and vote for them in a primary runoff election.  That point supports Alabama's
interest in keeping the primary runoff election closer than nine weeks from the primary election.
It says nothing about the turnout or interest of UOCAVA voters, who have been given the
opportunity to cast their ballots in the primary runoff election with less additional effort than is
required of other voters to participate in the second election.  *Cf.* **Doc. 25-1, PageID.446-448,
455.**

voters to the extent that they do not know what they are voting for or against," *id.* at 982.  But, there is no allegation—and no factual basis—for claiming that Alabama is misleading anyone. *Smith* concerned a private enterprise to trick voters into electing one candidate with the intention of switching that candidate out after the nomination was secured.  *Smith*, 489 F.2d at 1100.  That the Seventh Circuit thought a claim had been stated helps Plaintiffs not at all.  Again, there is no allegation—and no factual basis—for claiming that Alabama is deceiving anyone.

Interestingly, the *Kohler* court included a sample ballot presenting candidates for election and 45 proposed constitutional amendments for consideration.  *Kohler*, 292 F.Supp. at 979 and Appendix A.  The court recognized that voters must come to the polls having prepared themselves in advance to make their choices on the amendments.  *Id.* at 981.  *Cf.* **Doc. 25-1, Page ID.445-450.**  Similarly, Alabama's voters can be imposed upon to consider the many candidates vying for their votes and make deliberative choices.  The information is available to them, and Alabama is not censoring it or distorting it.

The challenged law simply asks UOCAVA voters to make their choices earlier in the election cycle.  They do so consistent with the complications and timing issues involved in voting from around the world.  Indeed, UOCAVA's 45-day rule is an acknowledgement of the additional time it takes for paper ballots to travel the world.  *See also* **Doc.24-5, PageID.192.**  The Plaintiffs have essentially opted-in to a form of early voting, something voters and organizations interested in voting rights may find desirable, **Doc. 25-1, Page ID.455-56;** Early Voting, *available at* https://www.aclu.org/issues/voting-rights/early-voting (last visited Feb. 19. 2020); Voting Rights, *available at* https://www.splcenter.org/our-issues/voting-rights (last visited Feb. 19. 2020).   By necessity, all absentee voters accept the risks of last-minute events and the duty for earlier education.

Plaintiffs have not shown that their First Amendment rights are severely burdened by the requirement that they cast a ranked ballot if they want to participate in the primary election and the primary runoff election for Congressional candidates. Any burden is minimal. Thus, it "trigger[s] less exacting review" and Alabama's "important regulatory interests," discussed *supra* at 1-2, 4-7, 19-20, sufficient to justify it. *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (internal citations and quotation marks omitted).

### B. Plaintiffs' claim that ranked choice voting schemes risk non-monotonicity is meritless because Plaintiffs have failed to challenge the specific system in place in Alabama.

Count II alleges that "Alabama's RCV Scheme contains an inherent risk of non-monotonicity," which Plaintiffs understand to result in the *wrong* person winning an election. **Doc. 1, PageID.16.** But the "RCV Scheme" Plaintiffs attack is one where the failure of a candidate to secure a majority in the first round of voting leads to one or more additional rounds wherein the lowest ranking candidate is dropped and his votes reallocated—all in an election where all of the voters are participating in this same "RCV Scheme." **Doc. 1, PageID.16-18;** *see also* **Doc. 1-4, PageID.41-44, 48-51.** That description does not fit Alabama's laws, and thus Plaintiffs' attack misses its mark. *Cf.* **Doc. 25-1, Page ID.439-445, 452-453.**

As explained above, Alabama uses ranked ballots only for UOCAVA voters and only in Congressional elections. Moreover, there is only one additional round—the primary runoff election between the top-two vote getters—and no votes are reallocated. Here are the details.

First, only UOCAVA voters receive the ranked ballots; everyone else votes a traditional ballot in the primary election and any primary runoff election, whether in person or absentee. Ala. Code § 17-13-8.1(a); Ala. Admin. Code § 820-2-10-.18(1)(a). Alabama has about 3.5 million voters, **Doc. 24-2, PageID.174,** but had only transmitted about 500 UOCAVA ballots as of

February 13, 2020, **Doc. 24-2, PageID.174.**  Some of those 500 ballots, like Plaintiff Jabbour's, will be non-partisan, and presumably some were for Democrats not living in Congressional District 1; none of these ballots would be ranked, **Doc. 24-2, PageID.173-174.**  Thus, the vast majority of ballots in the election are not ranked.  *Cf.* **Doc. 25-1, Page ID.444-445.**

Second, UOCAVA voters actually receive multiple ballots (they are separate pieces of paper ballots, or separate sections of a unified electronic ballot).  Ala. Admin. Code § 820-2-10-.18(1)(d); **Doc. 24-2, PageID.174.**  A *special federal ballot* contains any Congressional offices with more than two candidates competing and lists the names of those candidates.  Ala. Code § 17-13-8.1(b)(1); Ala. Admin. Code § 820-2-10-.18(1)(b)(1) & (1)(c)(1).  This is the ranked ballot, and it can be voted in the primary election and/or the primary runoff election, Ala. Code § 17-13-8.1(c)(5); Ala. Admin. Code § 820-2-10-.18(1)(c)(1).  We'll return to how to complete it momentarily.  For now, it's important to recognize that this ranked ballot does not contain Presidential candidates[13], State candidates, county candidates, or any proposed constitutional amendments.  All of those are on a separate *special State ballot* which is completed traditionally.  Further, any Congressional elections with only two candidates are also on this *special State ballot*, not the ranked ballot.[14]  Ala. Code § 17-13-8.1(b)(1) & (b)(2); Ala. Admin. Code § 820-2-10-.18(1)(c)(1) & (1)(c)(2).

Third, to complete the picture, any office on the *special State ballot* that goes to a primary runoff election will be printed on a *special State ballot for a second primary* (*i.e.,* primary runoff)

---

[13]   Alabama does not have primary runoffs for President.  Ala. Admin. Code § 820-2-10-.18(1)(a).  If she did, the question of whether UOCAVA can constitutionally apply to that election would present itself.

[14]   Two candidates cannot prompt a primary runoff election; one of the candidates will necessarily receive a majority of the vote.  And, if there is only one candidate, that person is the party nominee without participating in the primary.  Ala. Code § 17-13-5.

*election* and transmitted pursuant to State law once it is ready.[15]  Ala. Code § 17-13-8.1(b)(3); Ala.

Admin. Code § 820-2-10-.18(1)(c)(3) & (1)(d)(3).  By design, it cannot have any federal offices

on it since any with the potential for a primary runoff were placed on the *special federal ballot*,

that is, the ranked ballot.  Ala. Code § 17-13-8.1(b); Ala. Admin. Code § 820-2-10-.18(1)(c).

Fourth, the ranked ballots thus consist of one or two races (a United States Senate race

and/or a United States House of Representatives race), as needed.  Ala. Code § 17-13-8.1(b)(1);

Ala. Admin. Code § 820-2-10-.18(1)(c)(1).  The ballots list the offices up for election with three

or more candidates and list the candidates.  Ala. Code § 17-13-8.1(b)(1); Ala. Admin. Code § 820-

2-10-.18(1)(c)(1).  The ballots further contain these instructions:

## INSTRUCTIONS

**How to make your candidate choice**

1. This ballot is for the Primary, March 3, 2020, and/or the Primary Run-Off, March 31, 2020.
2. On this ballot you can rank the candidates in each contest.
3. If you return your ballot for the Primary, your highest ranked choice will be counted for the Primary, and your highest ranked choice of the Primary Run-Off candidates will be counted for the Primary Run-Off.
4. If your ballot is only for the Primary Run-Off, your highest ranked choice of the Primary Run-Off candidates will be counted.
5. You are not required to rank more than one candidate on the ballot, but you may rank as many as you choose.
6. If you only want to rank one candidate, write the number "1" on the line next to that candidate.
7. If you want to rank more than one candidate, write the number "1" on the line next to your first choice, the number "2" on the line next to your second choice, the number "3" on the line next to your third choice, and so forth.
8. If you rank more than one candidate in a contest, each candidate you rank must be given a different number.

**Doc. 24-2, PageID.179-180;** *see also* **Doc. 24-2, PageID.183-184.**

---

[15]      This ballot can also contain any referenda scheduled to be voted on at the primary runoff election.  Ala. Code § 17-13-8.1(b)(3).

Thus, voters may only rank their first choice, which will be counted in the primary election and any primary runoff election to which that candidate advances, or they may rank their choices from first to wherever they choose to stop.  Ala. Code § 17-13-8.1(c)(2) & (c)(5); Ala. Admin. Code § 820-2-10-.18(1)(h)(1).  If there are five candidates, it is perfectly acceptable to only rank two or three or four of them, just as a voter may only pick one or rank all five. Ala. Code § 17-13-8.1(c)(2).  If there is a primary runoff election, the UOCAVA voter's ballot will be examined to see which of the two candidates in that primary runoff election is ranked highest, if either; the vote will be counted for that candidate.  Ala. Code § 17-13-8.1(c)(5); Ala. Admin. Code § 820-2-10-.18(1)(h)(3).[16]  At both the primary election and primary runoff election stages, the UOCAVA votes are added to everyone else's votes to determine the results.  Ala. Code § 17-13-8.1(c)(5) & (e); Ala. Admin. Code § 820-2-10-.18(1)(h).

Thus, Alabama does not use the ranked ballots for all voters or for all offices, she does not use third or subsequent rounds, she does not drop candidates one at a time, and no votes are reallocated.  *See supra* at 24-27; *cf.* **Doc. 25-1, Page ID.440-445.** The Plaintiffs assert that non-monotonicity can occur, but, if it happens at all, it is rare, *Cf.* **Doc. 25-1, Page ID.452-453,** and they offer no facts or studies to suggest it could happen when less than 1% of the electorate is casting a ranked choice ballot.

To the extent that Plaintiffs are unsure how to game the system, it is because they are thinking about some other system.  In Alabama, UOCAVA voters should pick their favorite candidate, and then as many further choices as they desire. *Dudum v. Arntz*, 640 F.3d 1098, 1105

---

[16]     In pertinent part, Ala. Admin. Code § 820-2-10-.18(1)(h)(3) provides: "If a federal second primary election is necessary, the vote to be counted as cast by each voter shall be the highest designated choice of the voter of the two candidates participating in the contest.  In the event that the voter has only ranked one choice, the vote will be counted for that candidate if he or she is a candidate in the federal runoff election."

(9th Cir. 2011) (". . . Voters are more free to vote their true preferences . . . ."). In this way, UOCAVA voters can participate in the election with ballots sent 45 days before the primary election and any primary runoff election, in compliance with UOCAVA, while the federal primary runoff election is held simultaneously with the other primary runoff elections and on the shorter schedule Alabama prefers (in protection of the interests of voters and of candidates).

### C. Plaintiffs' claim that ranked choice voting leads to ballot exhaustion is due to be dismissed because Plaintiffs have failed to challenge the specific system in place in Alabama and because Plaintiffs are trying to advance the rights of non-parties.

Count III alleges that Plaintiffs are "sever[ly] burden[ed] . . . because a substantial portion of the electorate exhaust their ballots, nullifying their vote." **Doc. 1, PageID.20** (bold and capitalization omitted). There are two fundamental problems with this argument. First, like much of the complaint, it is grounded in a misunderstanding of how Alabama uses ranked choice ballots. Second, it is focused on the rights of parties not before the court.

Plaintiffs' theory of ballot exhaustion is based on their description of a ranked choice voting system where there are multiple rounds of balloting, with candidates dropped at each round and votes reallocated. *See e.g.,* **Doc. 1, PageID.17, 20-22; Doc. 1-4, PageID.46-48.** As discussed above, this is not how ranked choice voting works in Alabama. Instead, the ranked ballots allow the UOCAVA voter to rank as many of the candidates as she wishes. The highest ranked candidate receives the vote in the primary election, and the highest ranked candidate to reach the primary runoff election receives the vote for that election. It is within the discretion of each voter whether to rank beyond the first choice. *Supra* at 26-27.

 Plaintiffs have not begun to explain how other voters choosing not to rank the candidates who reach the primary runoff election creates a cognizable, constitutional harm to Plaintiffs. Instead, Plaintiffs appear to be focused on advancing the interests of others, **Doc. 1, PageID.20-**

**22;** *see also* **Doc. 1, PageID.11** ("harming Plaintiffs and those similarly situated to them"), when no class has been certified and NDC has not alleged that it has members to protect, *supra* at 11-12. This raises additional standing issues, *Harris v. Evans*, 20 F.3d 1118, 1121 (11th Cir. 1994).

There are times when a party can bring a lawsuit on behalf of someone else "provided three important criteria are satisfied." *Harris*, 20 F.3d at 1122 (*quoting Powers v. Ohio*, 499 U.S. 400, 409-12 (1991)). First, the Plaintiffs would need their own injury, *id.*, which they do not have for reasons discussed above. Second, Plaintiffs would need to have a "close relation to the third party," *Harris* at 1122 (still *quoting Powers*), which they do not. And, third, "there must exist some hinderance to the third party's ability to protect his or her own interests," *Harris* at 1122 (still *quoting Powers*), which there is not.

Not only could other UOCAVA voters assert their own interests, but they might disagree with Plaintiffs' policy choices around ranked voting. "Standing promotes the separation of powers by preventing 'overjudicialization of the process of self-governance.' Scalia, *The Doctrine of Standing* [*as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881,] at 881 [(1983)]. It serves judicial efficiency by 'prevent[ing] the judicial process from becoming no more than a vehicle for the vindication of the value interests of concerned bystanders.' *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 687, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). . . . And it ensures that 'people cannot be intermeddlers trying to protect others who do not want the protection offered.' Erwin Chemerinsky, Federal Jurisdiction 59 (5th ed. 2007)." *Nicklaw v. CitiMortgage, Inc.*, 839 F.3d 998, 1001-02 (11th Cir. 2016) (3rd alteration by the court). These warnings ring true here. Not only is Count III grounded in a fundamental misunderstanding of Alabama's ranked choice ballots for UOCAVA voters, but it purports to

assert the interests of other UOCAVA voters without any concern for their potentially differing views and without standing to do so.

## VI. Conclusion

This court lacks jurisdiction to consider Plaintiffs' claims and the claims are meritless. The case is due to be dismissed.


Respectfully Submitted,

Steve Marshall
  *Attorney General*

s/Misty S. Fairbanks Messick
Winfield J. Sinclair (ASB-1750-S81W)
Misty S. Fairbanks Messick (ASB-1813-T71F)
*Assistant Attorneys General*

Office of the Attorney General
501 Washington Avenue
Post Office Box 300152
Montgomery, Alabama 36130-0152
telephone:   334.353.8674
facsimile:   334.353.8400
Winfield.Sinclair@AlabamaAG.gov
Misty.Messick@AlabamaAG.gov

**Counsel for the State Defendants**