IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| MIRNA MICHEL JABBOUR, and ) <br> NATIONAL DEFENSE COMMITTEE, ) <br> ) <br>    Plaintiffs, ) <br> ) <br>  v. ) <br> ) <br> JOHN H. MERRILL, in his official capacity ) <br> as Secretary of State, MOBILE COUNTY ) <br> BOARD OF REGISTRARS, KYLE ) <br> CALLAGHAN, in his official capacity as a ) <br> member of the Mobile County Board of Registrars, ) <br> JUDY MOTLOW, in her official capacity as a ) <br> member of the Mobile County Board of Registrars, ) <br> and RON REAMS, in his official capacity as a ) <br> member of the Mobile County Board of Registrars, ) <br> ) <br>    Defendants. ) | Case No. 1:20-cv-00034-JB-N |

### STATE DEFENDANTS' OPPOSITION TO
### PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Alabama adopted a ranked choice ballot to serve UOCAVA voters[1] participating in Congressional elections while simultaneously protecting the interests of other voters and of candidates, all of whom are impacted by how the State designs her election system. Plaintiffs—a lone UOCAVA voter and an advocacy organization—ask this court to unilaterally upend Alabama's careful balancing of interests because they disapprove of ranked choice voting, and they ask that this court do so while the election is already underway. The State Defendants oppose Plaintiffs' motion for preliminary injunction, **Doc. 3, PageID.74-101,** because Plaintiffs are not likely to prevail on the merits and the equities do not favor granting injunctive relief.

---

[1] Voters protected by the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), as modified by the Military and Overseas Voter Empowerment Act (MOVE Act), 52 U.S.C. § 20301, *et seq. See* 52 U.S.C. § 20310 (definitions); *United States v. Alabama*, 778 F.3d 926, 929 n. 1 (11th Cir. 2015) (describing UOCAVA voters).

1

### I.     Factual Background

The State Defendants set out the Factual Background for this litigation at length in a section of their motion to dismiss with the same title, **Doc. 27, PageID.477-483,** and they incorporate that discussion by reference here. Additional relevant facts were set out in a section that addressed Plaintiff Jabbour's lack of standing, **Doc. 27, PageID.485-486,** and the State Defendants incorporate that discussion by reference as well. After the State Defendants filed, the Plaintiffs submitted a Second Declaration of Mirna Michel Jabbour, **Doc. 28-1, PageID.509-512.** This development warrants brief discussion.

Ed Packard, Administrator of Elections in the Secretary of State's office, has explained the following in his declaration:

> 21.     There are absentee election managers (AEMs) in each county who receive and respond to applications from voters for absentee ballots. Alabama maintains a statewide voter registration system called PowerProfile. AEMs record information in PowerProfile about absentee ballots that have been requested. This information includes whether the voter has designated a political party preference or has declined to designate a political party preference. For those UOCAVA voters requesting electronic ballots, and based on the information recorded in PowerProfile, I send a data file to the electronic ballot vendor informing the vendor to whom the requested ballots should be sent and which ballot should be sent to each voter.
>
> 22.     After this litigation was filed, I accessed Plaintiff Mirna Michel Jabbour's record in PowerProfile. That record reflected a request for an absentee ballot to be transmitted to her electronically and that no political party was designated. Based on that information, I included Plaintiff Jabbour in the January 17, 2020 data file to the vendor, thereby asking the vendor to send her a nonpartisan ballot electronically. Thus, the ballot she was to receive would look like **Exhibit E**. **[Doc. 24-2, PageID.185]**
>
> 23.     After this litigation was filed, I contacted the AEM in Mobile County to confirm that the PowerProfile record was correct. The AEM pulled Plaintiff Jabbour's absentee ballot application while we were on the phone and she confirmed that Plaintiff Jabbour had not designated a political party preference on her absentee ballot application. Since then, I have received confirmation from the Secretary of State's vendor that an electronic ballot was transmitted to Plaintiff Jabbour.

24. Non-partisan ballots are sent to all registered voters, including those protected by UOCAVA, who timely request an absentee ballot for a primary election or primary runoff election but do not designate a political party preference.

**Doc. 24-2, PageID.177-178.**

Plaintiff Jabbor's second declaration includes her UOCAVA Application for Absentee Ballot, **Doc. 28-1, PageID.509, 512,** which confirms that she did not indicate that she wanted the Republican Party ballot, **Doc. 28-1, PageID.512.** The relevant portion of her form is displayed below:

```
Type of Ballot (select one)
[X] Primary Election or Presidential Preference Primary
    Select one: [ ] Democratic Party
                [ ] Republican Party
                [ ] Other _____
                [ ] Amendments Only

[ ] Primary Runoff Election
    Select one: [ ] Democratic Party
                [ ] Republican Party
                [ ] Other _____
                [ ] Amendments Only

[ ] General Election

[ ] Special Election (specify) _____
    if a primary or runoff, check one: [ ] Democratic Party  [ ] Republican Party
```

**Doc. 28-1, PageID.512.** Thus, while Plaintiff Jabbour indicated that she wanted the primary election ballot, she did not also *Select one* of the different ballots available in the primary election. **Doc. 28-1, PageID.512.** And, as a result, she was sent the non-partisan ballot that does *not* employ ranked choice voting. **Doc. 24-2, PageID.177-178.**

3

## II.     Preliminary Injunction Standard

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008); *see also Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (*en banc*) ("A district court may grant injunctive relief only if the moving party shows that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.").

"The preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly carries the burden of persuasion as to the four prerequisites.  The burden of persuasion in all of the four requirements is at all times upon the plaintiff." *United States v. Jefferson County*, 720 F.2d 1511, 1519 (11th Cir. 1983) (internal citations and quotation marks omitted).  "Failure to show any of the four factors is fatal, and the most common failure is not showing a substantial likelihood of success on the merits." *Am. Civil Liberties Union of Fla., Inc. v. Miami-Dade Cty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009); *see also GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Engineers,* 788 F.3d 1318, 1329 (11th Cir. 2015) ("Because the plaintiffs have not shown a substantial likelihood of success on the merits, we need not consider the remaining factors in the preliminary injunction test."). "[E]ven if Plaintiffs establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." *Siegel*, 234 F.3d at 1176.

"Because a preliminary injunction is an extraordinary and drastic remedy, its grant is the exception rather than the rule . . . ." *United States v. Lambert*, 695 F.2d 536, 539 (11th Cir. 1983) (internal citation and quotation marks omitted); *Winter*, 555 U.S. at 24 ("A preliminary injunction is an extraordinary remedy never awarded as of right."); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311 (1982) ("It goes without saying that an injunction is an equitable remedy. It is not a remedy which issues as of course . . . .") (internal citation and quotation marks omitted).

Moreover, "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Thus, "[t]ypically, a preliminary injunction is prohibitory and generally seeks only to maintain the status quo pending a trial on the merits. When a preliminary injunction goes beyond the status quo and seeks to force one party to act, it becomes a mandatory or affirmative injunction and the burden placed on the moving party is increased." *Mercedes-Benz U.S. Int'l, Inc. v. Cobasys, LLC*, 605 F. Supp. 2d 1189, 1196 (N.D. Ala. 2009) (internal quotation marks, citations, and footnote omitted). *See also Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976)[2] ("Mandatory preliminary relief, which goes well beyond simply maintaining the status quo pendent lite, is particularly disfavored and should not be issued unless the facts and law clearly favor the moving party.") (citations omitted); *Boyd v. Steckel*, 753 F. Supp. 2d 1163, 1169 (M.D. Ala. 2010) ("For such mandatory injunctions, relief should be granted *[o]nly in rare instances.*") (alterations by the court, internal citations and quotation marks omitted).

---

[2]  This decision is binding. *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*) ("We hold that the decisions of the United States Court of Appeals for the Fifth Circuit (the 'former Fifth' or the 'old Fifth'), as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, shall be binding as precedent in the Eleventh Circuit, for this court, the district courts, and the bankruptcy courts in the circuit.").

### III.     Plaintiffs Are Not Likely to Succeed on the Merits or Suffer an Irreparable Harm.

Plaintiffs are not likely to succeed on the merits or to suffer irreparable harm in the absence of preliminary relief because they lack standing and their claims are meritless, for all the reasons set out in the State Defendants' motion to dismiss, **Doc. 27, PageID.473-505,** and incorporated herein by reference. Rather than spend time restating what has just been said in that motion, the State Defendants limit their discussion of the merits to futility of Plaintiff Jabbour's attempt to belatedly create jurisdiction.

As we previously argued, **Doc. 27, PageID.485-486,** and as Plaintiff Jabour's application for an absentee ballot confirms, *see supra* at 2-3, Plaintiff Jabbour did not have standing when this litigation was filed. She failed to request an absentee ballot for a political party's primary election, and so the Secretary's office directed the electronic ballot vendor to send the non-partisan ballot, and all of that happened before the lawsuit was filed. *See supra* at 2-3.

"[T]he standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (*citing Friends of the Earth, Inc. v. Laidlaw Envtl Serv. (TOC), Inc.*, 528 U.S. 167, 180 (2000), and *Arizonians for Official English v. Arizona*, 520 U.S. 43, 68 n. 22 (1997)); *see also Raines v. Byrd*, 521 U.S. 811, 818 (1997) ("One element of the case-or-controversy requirement is that appellees, based on their complaint, must establish that they have standing to sue."). Thus, even if this court were to assume that the State of Alabama would issue Plaintiff Jabbour a different ballot for the primary election, as she apparently plans to request, **Doc. 28-1, PageID.510**, it would not cure her lack of standing at the time she filed this case. Accordingly, Plaintiff Jabbour's claims remain due to be dismissed.

### IV.     The Equities Do Not Favor the Grant of a Preliminary Injunction.

The "balance of equities" and the public interest, *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008), are clearly against granting preliminary injunctive relief, particularly at this late stage in the election process.  The election is underway and there is no way that this court can provide relief to the Plaintiffs without taking the State out of compliance with UOCAVA's 45-day rule, 52 U.S.C. § 20302(a)(8), or rescheduling the federal primary runoff election to a later date (and, necessarily, a date after any State and county primary runoff elections).  *See* **Doc. 21, PageID. 160-161.**  Either option would impact other UOCAVA voters who may *prefer or benefit from* the ranked choice voting method the State employs, and the latter option could impact millions more eligible voters.

A 2015 law moved the primary to the first Tuesday in March in Presidential election years, like this year.  Ala. Act No. 2015-239.  Then, in 2019, the Alabama Legislature moved the runoff election to four weeks after the primary and made other changes.  Ala. Act No. 2019-318.  The result is that the 2020 primary election will be held on March 3, 2020 and any primary runoff will be held four weeks later on March 31, 2020.  Ala. Code § 17-13-3; Ala. Code § 17-13-18(b).

Forty-five days before the March 3 primary was January 18; thus, any UOCAVA ballots requested by January 18 were due to be transmitted by that date.  52 U.S.C. § 20302(a)(8).  Forty-five days before any potential March 31 primary runoff was February 15, and so any UOCAVA ballots requested for any primary runoff election were to be transmitted by then, if requested by then.  52 U.S.C. § 20302(a)(8).   Federal ballots for UOCAVA voters requested less than 45 days before an election are to be transmitted "(i) in accordance with State law; and[,] (ii) if practicable and as determined appropriate by the State, in a manner that expedites the transmission of such

absentee ballot[.]"  52 U.S.C. § 20302(a)(8)(B). Thus, the federal election is on-going, and the challenged ballots are out for use by UOCAVA voters.

Juxtaposed against those dates in the table below, the complaint in this case was not filed until January 21, **Doc. 1, PageID.1,** and the Secretary of State was not served until ten days later on January 31, **Doc. 11, PageID.129.** The Board of Registrars and its Members were served earlier then the Secretary, **Doc. 10, Page ID.121, 123, 125, 127,** but they are not proper defendants in this matter, **Doc. 27, PageID.487-493,** and even they were served after the election was underway. Thus, even if this court had not appropriately granted the State Defendants sufficient time to defend themselves, Plaintiffs had not afforded this court sufficient time to rule without disrupting an on-going election.[3]

| Event | Date |
|---|---|
| 45-day deadline for March 3, 2020 primary election | January 18, 2020 |
| Complaint filed | January 21, 2020 |
| Secretary of State served | January 31, 2020 |
| 45-day deadline for March 31, 2020 primary runoff election | February 15, 2020 |
| **PRIMARY ELECTION** | **March 3, 2020** |
| **PRIMARY RUNOFF ELECTION** | **March 31, 2020** |
| | |

---

[3] The motion for preliminary injunction says that "Alabama's primary election is approximately three months away" and "If a runoff election is required, that election would not be slated for another month after that—approximately three months from the filing of this brief." **Doc. 3, PageID.98.**  As set out in the text, this is inaccurate, and was even at the time that the complaint and motion were filed.

By the time the complaint was filed in this case, ballots were due to be sent to UOCAVA voters who had requested them.  As of the afternoon of February 13, 2020, ballots had been transmitted to 498 UOCAVA voters.  **Doc. 24-2, PageID.174.**  For those UOCAVA voters who requested to participate in a partisan primary with more than three candidates in a Congressional election, those ballots were necessarily the ranked choice ballots challenged in this litigation.  *See* **Doc. 24-2, PageID.173-180, 183-184.**  The ranked ballots explained to the voters how they would be casting their ballots simultaneously in the primary election and the primary runoff election by ranking as many of the candidates as they liked.  **Doc. 24-2, PageID.179-180, 183-184.**  Plaintiffs are asking this court to require that these voters—and potentially all voters—be given different instructions about how the election will proceed, at a time when it is underway.

Plaintiffs have suggested that this should be done with traditional ballots sent to UOCAVA voters and an extended deadline for the return of their cast ballots after the election.  **Doc. 1, PageID.23.**  That scenario would take the State out of compliance with UOCAVA's 45-day rule, 52 U.S.C. § 20302(a)(8), because the traditional ballots cannot be sent until we have the election results from the primary election (so that we know whose names to put on those ballots) and because the 45-day deadline for the primary runoff election has already passed.

Plaintiffs point out that UOCAVA includes a provision allowing for waivers of the 45-day rule, *see* 52 U.S.C. § 20302(g), and, in the complaint, point to the provision applicable when "The State's primary election date prohibits the State from complying with subsection (a)(8)(A)," 52 U.S.C. § 20302(g)(2)(B)(i).  **Doc. 1, PageID.23;** *see also* **Doc. 3, PageID. 95** (preliminary injunction motion).  A waiver under that provision is due "not later than 90 days before the election for Federal office with respect to which the request is submitted."  52 U.S.C. § 20302(g)(3)(A).

Since the waiver would be requested with respect to the March 31primary runoff election, the waiver application was due 90 days earlier on January 1—before this litigation was filed.

When the State Defendants argued that they would not timely submit the suggested waiver application, **Doc. 13, PageID.133,** the Plaintiffs responded that the State could seek a waiver based on "suffer[ing] a delay due to a legal contest," 52 U.S.C. § 20302(g)(2)(B)(ii). **Doc. 21, PageID.160-61.** It does appear that "legal contest" is broad enough to encompass this litigation, and the State is not categorically excluded from seeking a waiver. However, it remains true that: (1) a waiver is only available when the State faces an "undue hardship," 52 U.S.C. § 20302(g)(2)(B), which is what the Plaintiffs seek to impose on the State; (2) the waiver is granted or denied at the discretion of the Presidential designee "[a]fter consulting with the Attorney General," 52 U.S.C. § 20302(g)(2), and so is not guaranteed; and, (3) the State would have to develop a "comprehensive plan" that provides UOCAVA voters "sufficient time to receive absentee ballots that they have requested and submit marked absentee ballots to the appropriate State election official in time to have that ballot counted in an election for Federal office," 52 U.S.C. § 20302(g)(2)(A).

The only way to give the ballots time to get back and be counted is to further extend the deadline—after Election Day—for the ballots to be transmitted. The Federal Voting Assistance Program (FVAP), in a document from the National Defense Committee's present Executive Director Bob Carey when he was the FVAP Director and the Presidential Designee, **Doc. 1-3, PageID.32**, provides:

> [C]omprehensive plans should maximize the number of days ballots are transmitted *before* an election rather than simply extend ballot return deadlines after the election. Days prior to Election Day are qualitatively superior to days after Election Day. Almost every election jurisdiction requires *UOCAVA* voters to vote and begin return transmission of their voter ballot no later than Election Day, and many before then. Therefore, a comprehensive plan that proposes a ballot transmission deadline

10

>as far before the election as possible, will, under these evaluation criteria, will (*sic*) be more favorably considered as providing sufficient time for the voter to receive, mark and return the ballot as a substitute for the 45-day prior requirement.

**Doc. 29-1, PageID.523.** This guidance remains available on the FVAP website today. Waiver Guidance, *available at* https://www.fvap.gov/uploads/FVAP/EO/2012_waiver_guidance.pdf (last visited Feb. 21, 2020). Given how close the primary runoff election would be under Plaintiffs' plan, and given the role of a third party's exercise of discretion, it is unclear whether the State would be able to get a waiver.

The only way that has been identified to give the Plaintiffs relief without taking the State out of compliance with UOCAVA's 45-day rule is to reschedule any federal primary runoff elections. *See* **Doc. 21, PageID. 160-161.** As was true when Judge Thompson was presented with the question of rescheduling the federal primary runoff election or using ranked choice ballots, **Doc. 24-9, PageID.249,** UOCAVA only concerns federal elections. 52 U.S.C. §§ 20301-20306 (repeatedly referring to elections for federal office). This court has no authority to reschedule any State and/or county primary runoff elections. *Clingman v. Beaver*, 544 U.S. 581, 586 (2005) ("The Constitution grants States broad power to prescribe the 'Times, Places and Manner of holding Elections for Senators and Representatives,' Art. I, § 4, cl. 1, which power is matched by [S]tate control over the election process for [S]tate offices.") (internal citations and quotation marks omitted); *see also* U.S. Const. Art. I, § 4, cl. 1 ("The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators.").

Thus, as before, the result would be that some voters (depending on the results of the primary election) could face the prospect of participating in a State and county primary runoff

11

election on March 31 and then a separate federal primary runoff election at some later date. That scenario continues to have the potential to: (1) cause voter confusion; (2) negatively impact voter turnout; (3) to negatively impact the various Congressional candidates who are currently planning for a shorter time period between the primary election and any primary runoff election; and, (4) burden election officials who must plan for and staff an additional election. *Cf.* **Doc. 24-9, PageID.249-50.**

With respect to the costs involved, the State Defendants do not have an estimate of what it would cost to attempt to notify the voting public about the changes to an on-going election. We do, however, know how much it cost to have a standalone, statewide federal primary runoff election in 2017 and what was paid to the counties wholly enclosed in Congressional Districts 1 and 2 for that election.[4] In 2017, Governor Ivey called a special election to fill the vacancy created by Senator Jeff Sessions' resignation from the United States Senate to become United States Senator. **Doc.29-2, PageID.532.** A statewide, special primary election runoff was held for that office on September 26, 2017. **Doc.29-2, PageID.532.** Statewide, the cost exceeded $3 million. **Doc.29-3, PageID.534.** Looking just to Congressional Districts 1 and 2, the cost exceeded $300,000. **Doc.29-3, PageID.534-535.**

The costs are high because the impact is high. The court has before it one UOCAVA voter who believes ranked choice ballots are unconstitutional and one organization which agrees. **Doc. 1, PageID.1-24.** The only evidence of what any other UOCAVA voters believe is Bob Carey 's declaration that UOCAVA voters have complained to him about the ranked choice ballots. **Doc.1-**

---

[4] Congressional Districts 1 and 2 are the only Congressional Districts with three or more candidates running for the House of Representatives, **Doc. 24-2, PageID.173-174,** which means that, in these Districts alone, there may be a federal primary runoff election even if the United States Senate race does not require a primary runoff election.

**3, PageID.33.** First, that evidence is hearsay, Fed. R. Evid. 801, and thus inadmissible, Fed. R. Evid. 802.  Second, as just as importantly, Carey's work with the National Defense Committee is not limited to Alabama and he does *not* say that the complaints he has heard came from Alabama voters.  **Doc.1-3, PageID.32-33.**   Third, even if the complaints were from Alabama voters, that would not tell this court how the majority of UOCAVA voters casting ranked choice ballots in Alabama's Congressional elections feel about the system.  Yet, Plaintiffs seek relief that would change how every UOCAVA voter who would otherwise be casting (or already has cast) a ranked ballot would be participating in Alabama's potential Congressional primary  runoff elections—or, if the court reschedules Alabama's potential Congressional primary  runoff elections, how every Alabama voter (UOCAVA and non-UOCAVA alike) would participate in the election.

Under these circumstances, this court should not interfere with the ongoing elections.  *See Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) ("Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase."); *Perry v. Judd*, 471 Fed.Appx. 219, 2012 WL 122076 (4th Cir. 2012) (rejecting a Presidential candidate's attempt to be added to the ballot days before the UOCAVA 45-day deadline, and noting that the candidate had come "perilously close to asking the federal courts to have state officials act in disregard of federal law").

Separate from timing issues, the harm which would result from an injunction barring enforcement of State statutes tips in favor of Secretary of State Merrill and the public, "both of whom have an interest in noninterference by a federal court in a [S]tate's 'legislative enactments' which 'should be recognized and enforced by the courts as embodying the will of the people, unless they are plainly and palpably, beyond all question, in violation of the fundamental law of

the Constitution.'" *Reed v. Riley*, 2:07-cv-0190-WKW, 2008 WL 3931612, *3 (M.D. Ala. Aug. 25, 2008) (Watkins, J.) (*quoting Atkin v. Kansas*, 191 U.S. 207, 223 (1903)); *see also Northeastern Florida Chapter of Ass'n of Gen. Contractors of America v. City of Jacksonville, Florida*, 896 F.2d 1283, 1285 (11th Cir. 1990) ("[P]reliminary injunctions of legislative enactments—because they interfere with the democratic process and lack the safeguards against abuse or error that come with a full trial on the merits—must be granted reluctantly and only upon a clear showing that the injunction before trial is definitely demanded by the Constitution and by the other strict legal and equitable principles that restrain courts.").

## V.     Security

In pertinent part, Fed. R. Civ. P. 65(c) provides that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Should this court determine that it is appropriate to preliminarily enjoin the State Defendants, they request that the court require security in a sufficient amount to cover the damages they will sustain in the event that the injunction is ultimately shown to have been in error.

## VI.     Conclusion.

For the foregoing reasons, Plaintiffs' motion for preliminary injunction should be denied. If the motion is granted, security should be required.

Respectfully Submitted,

Steve Marshall
  *Attorney General*

s/Misty S. Fairbanks Messick
Winfield J. Sinclair (ASB-1750-S81W)
Misty S. Fairbanks Messick (ASB-1813-T71F)
*Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Post Office Box 300152
Montgomery, Alabama 36130-0152
telephone:    334.353.8674
facsimile:    334.353.8400
Winfield.Sinclair@AlabamaAG.gov
Misty.Messick@AlabamaAG.gov

*Counsel for the State Defendants*