## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **MIRNA MICHEL JABBOUR and** | ) | |
| **NATIONAL DEFENSE COMMITTEE,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Case No. 1:20-cv-00034-JB-N** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **JOHN H. MERRILL, in his official** | ) | |
| **capacity as Alabama Secretary of State,** | ) | |
| **MOBILE COUNTY BOARD OF** | ) | |
| **REGISTRARS, KYLE CALLAGHAN,** | ) | |
| **in his official capacity as a member of** | ) | |
| **the Mobile County Board of Registrars,** | ) | |
| **JUDY MOTLOW, in her official** | ) | |
| **capacity as a member of the Mobile** | ) | |
| **County Board of Registrars, and RON** | ) | |
| **REAMS, in his official capacity as a** | ) | |
| **member of the Mobile County Board** | ) | |
| **of Registrars,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## PLAINTIFFS' SUPPLEMENTAL COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

Pursuant to Federal Rule of Civil Procedure 15(d), Plaintiffs, Mirna Michel Jabbour and National Defense Committee ("NDC") (collectively, "Plaintiffs"), file this Supplemental Complaint for Declaratory and Injunctive Relief, which alleges the occurrence of facts occurring after the original complaint was filed. This Supplemental Complaint is substantially similar in all respects to Plaintiffs' original Complaint with the exception of paragraphs 9-19 and 23, which allege additional

factual developments, and the removal of the Mobile County Board of Registrars, Kyle Callaghan, Judy Motlow, and Ron Reams as Defendants.

Although Plaintiffs believe the inclusion of the additional facts is not necessary for their claims to be successful, they allege them here out of an abundance of caution, to assist the Court in reaching the correct decision, and to further the interests of justice and judicial economy.

Plaintiffs for their Supplemental Complaint against Defendant John H. Merrill, in his official capacity as Alabama Secretary of State ("Secretary"), Mobile County Board of Registrars ("MCBOR"), and Kyle Callaghan, Judy Motlow, and Ron Reams, in their official capacities as members of the MCBOR, state and allege as follows:

## INTRODUCTION

1.      This action challenges on federal constitutional grounds Alabama's Instant Runoff Primary Election scheme, or Ranked Choice Voting scheme ("RCV Scheme"), for voters who are voting by absentee ballot pursuant to the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") of 1986, 52 U. S. C. §§ 20301, *et seq*., because it forces military and overseas voters to cast ballots through an unconstitutional process that requires an uninformed vote, risks not accurately reflecting the will of the majority, and compels them to associate with political parties and candidates. Ala. Code § 17-13-8.1 (Exhibit 1 of Original Complaint).

The RCV Scheme is a ranked choice ballot sent only to UOCAVA voters during primary elections for federal office. *Id*. For UOCAVA voters to be able to cast a ballot in any potential runoff election, UOCAVA voters are asked to rank all candidates in order of preference, after which Alabama tabulates the "first-ranked" choices and adds those votes to each candidate's total in the initial primary election tabulations. *Id*. If a runoff election is necessary, UOCAVA voters do not receive an additional ballot. *Id*. Instead, Alabama tabulates the highest ranked preference for a remaining candidate from their initial primary ballot and distributes those votes during the runoff primary. *Id*.

2.      Plaintiffs are a non-profit organization further military voting rights and a U.S. citizen who is currently residing overseas. *See generally*, Jabbour Decl. (attached to Original Complaint at Exhibit 2); Carey Decl. (attached to Original Complaint at Exhibit 3). In furthering military voting rights, NDC represents military members voting via Alabama's ranked choice UOCAVA primary ballot.

3.      Alabama's use of these ranked choice ballots violates the Fourteenth Amendment to the United States Constitution, and the First Amendment as applied to the states via the Fourteenth Amendment. Accordingly, Plaintiffs seek a declaration that the use of the RCV Scheme is unconstitutional and seek a preliminary injunction directing the Secretary to suspend the use of ranked choice ballots.

4.     Plaintiffs also request that this Court order Alabama to extend the time between primary and runoff elections, by rescheduling the date on which runoff elections are scheduled to take place, so that UOCAVA voters are afforded enough time to be sent a separate runoff ballot. Alternatively, Plaintiffs request that this Court order an extension of time for UOCAVA voters to mail in their primary runoff specific ballot, so long as that ballot is postmarked by the election date.

5.     The right to vote is encompassed in the right to free speech and freedom of assembly, rights protected under the First Amendment and the Due Process Clause of the Fourteenth Amendment. *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 460-61 (1958); *Burdick v. Takushi*, 504 U.S. 428, 441-42 (1992). "Voting is the beating heart of democracy. It is a fundamental political right, because it is preservative of all rights. [Accordingly], [i]t is beyond cavil that voting is of the most fundamental significance under our constitutional structure." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1315 (11th Cir. 2019) (internal quotation marks and citations omitted). In particular, Supreme Court precedent dictates that election laws severely burdening the right to vote must be narrowly drawn to serve a compelling government interest. *Burdick*, 504 U.S. at 434. The right to vote on nonarbitrary terms is also protected by the Due Process Clause of the Fourteenth Amendment, which precludes arbitrary or unduly burdensome regulations of the voting process. U.S. Const. amend XIV. *See also, e.g., Bell v. Wolfish*, 441 U.S. 520

n.15 (1979) (citing, *inter alia, Illinois Elections Board v. Socialist Workers Party*, 440 U.S. 173 (1979)); *United States v. Texas*, 252 F. Supp. 234, 250 (W.D. Tex. 1966) (three-judge District Court), *summarily aff'd*, 384 U.S. 155 (1966) ("In . . . light of Supreme Court pronouncements describing it as our most 'precious' right, and … the 'essence of a democratic society,' it cannot be doubted that the right to vote is one of the fundamental personal rights included within the concept of liberty as protected by the Due Process Clause.").

6.     Additionally, the right to participate in primary elections where a political party chooses its standard bearer, and the right of a political party to choose the method by which its standard bearer is selected, involves both freedom of speech and association protected by the First Amendment. *See Cal. Democratic Party v. Jones*, 530 U.S. 567 (2000).

7.     Alabama's RCV Scheme is not narrowly tailored and therefore Alabama cannot overcome the severe burden it places on the voting rights of members of the military and overseas voters. Much simpler and less constitutionally burdensome alternatives exist that would accomplish the state's asserted interests in complying with UOCAVA, such as simply extending the time between primary and runoff elections or extending the time for UOCAVA voters to return traditional election specific ballots for the primary runoff.

# PARTIES

8.      Plaintiff Mirna Michel Jabbour is a United States Citizen living in Lebanon. *See* Jabbour Decl. (Ex. 2). Ms. Jabbour was born in Lebanon and became a naturalized United States citizen on December 8, 2017. *Id*. Ms. Jabbour is registered to vote in Alabama, and, because she currently resides in Lebanon, plans on voting by absentee ballot in the next federal primary election. *Id*.

9.      On or about January 7, 2020, Plaintiff Mirna Michel Jabbour submitted a UOCAVA Application for Absentee Ballot, Form AV-U1, to the Mobile County Absentee Election Manager. (Doc. 28-1, PageID#509).

10.      At the time she completed and submitted her Form AV-U1, and at all times since, Ms. Jabbour intended and desired to vote in the Republican Primary Election and Republican Primary Runoff Election, if one is conducted. *Id*.

11.      Due to confusion regarding the Form AV-U1 and Alabama's Ranked Choice Voting system itself, Ms. Jabbour inadvertently omitted an indication that she wished to vote in the Republican Primary Election. (Doc. 28-1, PageID#509-10).

12.      Ms. Jabbour's error was due to confusion with regards to the instructions on the Form AV-U1, which ask applicants to indicate "Type of Ballot" and instructs voters to "select one" despite there being separate boxes for "Primary Election or Presidential Preference Primary" and "Primary Runoff Election". *Id*.

13.     Ms. Jabbour's error was also the result of confusion regarding the instruction to "select one" "type of ballot" and instead she selected only one box—that of Primary Election or Presidential Preference Primary. The instructions on the Form AV-U1 do not match Alabama's Ranked Choice Voting System. *Id.*

14.     As soon as she was made aware that the State did not consider her Form AV-U1 as originally completed to qualify her to vote in the Republican Primary Election and Republican Primary Runoff Election she began the process of completing and submitting a new Form AV-U1. *Id.*

15.     Ms. Jabbour completed a new Form AV-U1, which clearly indicated that she wishes to vote in the Republican Primary Election and Republican Primary Runoff Election, should there be one. *Id.*; Third Declaration of Mirna Michel Jabbour at 1-2.

16.     On Friday, February 21, 2020, Ms. Jabbour's new complete Form AV-U1 was sent to the Mobile Absentee Election Manager. Third Declaration of Mirna Michel Jabbour at 2.

17.     Ms. Jabbour's new Form AV-U1 was received by the Mobile Absentee Election Manager at 6:08am on February 22, 2020. Third Declaration of Mirna Michel Jabbour at 3.

18.     Ms. Jabbour never received an absentee ballot in response to her previous Form AV-U1 application. Third Declaration of Mirna Michel Jabbour at 4.

19.     Ms. Jabbour is completely qualified and eligible to vote pursuant to UOCAVA in Alabama's Republican Primary Election on March 3, 2020 and any subsequent runoff election.

20.     Ms. Jabbour is forced to vote pursuant to Alabama's RCV Scheme and fears that her vote may actually harm the candidates she wishes to support, that her lengthy ballot may be spoiled due to her confusion, that she faces a substantial burden in having to learn in advance about the potential differences among candidates who are not among her top choices in case they nonetheless advance to a runoff, and that her inability to change her vote between the primary and runoff election may cause her vote to count for a candidate who she ultimately does not wish to support in the runoff. *Id.* Further, Ms. Jabbour fears that her ballot may not count during the runoff due to ballot exhaustion. *Id.* Ms. Jabbour's ballot exhaustion concerns lead her to feel compelled to vote in advance for candidates whom she would not otherwise wish to vote for, otherwise she could lose voting power by not having a vote in the runoff. *Id.*

21.     Plaintiff National Defense Committee is a non-profit organization dedicated to the purpose of providing education and communication throughout the nation on national defense issues. *See* Carey Decl. (Ex. 3). NDC encourages deeper understanding of the importance of national defense issues in the United States through the dissemination of educational and research materials and the provision of

testimony to promote legislation and other activities affecting national defense issues. *Id*. Since 2004, NDC has been actively involved in military voting rights, testifying before the United States Election Assistance Commission, the United States Senate, and the United States House of Representatives, as well as serving as a founding member of the Alliance of Military and Overseas Voting Rights. *Id*. Given its mission, NDC is dedicated to making voting for UOCAVA voters easier and more effective. *Id*.

22.     As members of the U.S military, the individuals NDC represents are routinely deployed or on assignment away from their residence while in federal service. While deployed or on assignment, these individuals vote pursuant to UOCAVA absentee ballots. Furthermore, because even the portion of individuals NDC represents membership that is not currently deployed could potentially be called to deploy or serve away from their residence at any time, those members may have to vote pursuant to UOCAVA. NDC represents service members from Alabama who are forced to vote pursuant to Alabama's RCV Scheme.

23.     Alabama's RCV Scheme poses a difficult challenge for NDC. NDC will need to devote additional time to educating Alabama's military voters on the perils of ranked choice voting. NDC is a small organization with limited resources and does not receive any assistance in educating military voters about how to request and cast UOCAVA ballots. Second Declaration of Robert Carey at 2-3. NDC

reasonably anticipates that the RCV Scheme will cause it to divert other resources, including money and limited time, to print forms and pamphlets to assist in educating Alabama's military voters about Alabama's RCV Scheme. *Id.* at 5-7. Because NDC is an organization of limited resources, the additional time educating Alabama voters will divert time and energy from educating other military voters on how to cast ballots in other states. *Id.*

24.     Defendant John H. Merrill is the Secretary of State of Alabama and is named as a Defendant in his official capacity. The Secretary of State is Alabama's chief election officer. Ala. Code § 17-1-3(a); *see also* Ala. Code § 17-13-8.1(g)-(h) (Ex. 1) (Secretary of State to implement RCV Scheme); Ala. Code §§ 17-11-5, 17-11-40, 17-11-41, 17-11-50, 17-11-51 (designating rulemaking authority and other election responsibilities to Secretary of State). The Secretary is, among other things, charged with receiving the results of Federal elections from the officials of each county and certifying the results. *See* Ala. Code §§ 17-12-9, 17-12-17, 17-12-21. As such, the Secretary is responsible for the administration of Alabama's RCV Scheme. The principal office of the Secretary's Elections Division is in Montgomery, Alabama.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction over this action pursuant to 28 U. S. C. §§ 1331, 1343(a), 2201, 2202; 42 U.S.C. §§ 1983, 1988.

26.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 (b)(2).

## ALLEGATIONS

<u>Alabama's Prior Runoff Election Regimes Conflicted with UOCAVA.</u>

27.     In Alabama, if no federal candidate receives a majority of the vote in a primary election, the two candidates receiving the most votes will face off in a "second primary," or "runoff election." Ala. Code § 17-13-18.

28.     The clash between Alabama's runoff elections and UOCAVA was the subject of years of litigation, eventually culminating in the creation of the RCV Scheme at issue in the present litigation.

29.     UOCAVA guarantees U.S. citizens who are active members of the Uniformed Services, the Merchant Marine, and the commissioned corps of the Public Health Service and the National Oceanic and Atmospheric Administration, their eligible family members, and U.S. citizens residing outside the United States the right "to use absentee registration procedures and to vote by absentee ballot in general, special, primary, and runoff elections for Federal office." 52 U.S.C. § 20302(a)(1). As amended, UOCAVA requires that states transmit absentee ballots to UOCAVA voters at least 45 days before an election for federal office to provide voters sufficient time to receive, mark, and return absentee ballots. *Id*. § 20302(a)(8)(A).

30.     In 2012, Alabama was holding its runoff elections six weeks following the federal primary election, Ala. Code § 17-13-3 (2011), but, under Alabama law, the results of the federal primary election were certified just 32 days before the runoff election. Ala. Code § 17-13-17, 17-12-15 (2011). That year, the United States Department of Justice ("DOJ"), sued the state of Alabama and then-Secretary of State Beth Chapman for, inter alia, violations of UOCAVA's 45-day advance ballot transmission requirement. *Id*. Complaint, *United States v. Alabama*, No. 2:12-cv-179 (filed Feb. 24, 2012) (ECF 1). DOJ alleged that Alabama failed to provide eligible UOCAVA voters a ballot that could be voted in a Federal primary runoff election when it transmitted UOCAVA ballots for the March 13, 2012 Federal primary election. *Id*. The United States District Court for the Middle District of Alabama granted DOJ a temporary restraining order and preliminary injunction extending the deadline for UOCAVA ballots. *United States v. Alabama*, 857 F. Supp. 2d 1236, 1238 (M.D. Ala. 2012).

31.     While the UOCAVA litigation was pending, Congressman Jo Bonner, who represented Alabama's 1st Congressional district, resigned necessitating a special election. *United States v. Alabama*, 2013 U.S. Dist. LEXIS 105006 (M.D. Ala. 2013). Due to the large number of primary candidates, there was a strong likelihood that a runoff election would be required pursuant to Section 17-13-18. *Id*. However, Alabama indicated a strong desire to seat a new member of congress

before Congress returned in January 2014. *Id*. Given the 45-day UOCAVA requirement, the parties determined that there would be insufficient time to conduct a special primary election, runoff election, and special general election before January 2014, while permitting UOCAVA voters 45 days to get their ballots. *Id*. Accordingly, the court ordered the Secretary of State to transmit instant runoff/ranked choice ballots to UOCAVA voters for the special primary election for the seat Jo Bonner was vacating and the 2014 regularly scheduled primary election. The Court also pushed the federal runoff election back to nine weeks after the primary for 2016 and beyond. *Id*. That solution, however, was not to last.

32.    Exacerbating the UOCAVA problem of its own making, Alabama has consistently shortened the time between its primary and runoff elections from nine weeks as determined by this court in 2013, to six weeks with the implementation of the RCV Scheme for UOCAVA voters in 2015, and now to just four weeks with the implementation of a 2019 amendment to Act No. 2019-318. *See* Ala. Code § 17-13-18 (b) (2019).

Alabama's Current Ranked Choice Voting Regime.

33.    Apart from the expedited circumstances of the 1st District's special election, Alabama has considered a number of complicated legislative fixes to its UOCAVA problem. Rather than simply providing for adequate time between its

primary, runoff, and general elections for UOCAVA voters to receive ballots, Alabama has attempted to use a variety of RCV schemes.

34.     In 2015 a scheme using RCV for all voters in federal runoff elections was introduced as HB 666, and passed the state house, but just missed getting through the Senate before the end of the legislative session. Motion for Relief from Judgment, *United States v. Alabama*, No. 2:12-cv-179 at 5 (filed Aug. 24, 2015) (ECF 153).

35.     Subsequently, a special Session was convened, and the more limited HB 29, covering only UOCAVA voters, was introduced, passed, signed into law, and ultimately codified as Section 17-13-8.1, the provision being challenged here. *United States v. Alabama*, No. 2:12-cv-179 at 5-6 (filed Aug. 24, 2015) (ECF 153). Under Section 17-13-8.1, only UOCAVA voters are obliged to use the RCV Scheme; other voters would vote in person in any federal runoff election six weeks after the primary election, or they can participate via standard absentee ballots, including newly printed absentee ballots for any eventual runoff. *United States v. Alabama*, No. 2:12-cv-179 at 5-6 (filed Aug. 24, 2015) (ECF 153).

36.     Pursuant to Section 17-13-8.1, UOCAVA voters from Alabama are given a ranked-choice voting ballot for non-presidential federal primary elections involving three or more candidates. Ala. Code § 17-13-8.1 (Ex. 1). These voters are sent a ballot listing all the candidates participating in the primary election. *Id*. Unlike

traditional absentee ballots, voters participating in Alabama's RCV Scheme are instructed to rank all candidates in order of preference. *Id*. For the primary election, the state looks to the first choice listed on each such ballot and adds those votes to each candidate's primary total. *Id*. The voters' choices other than their first-choice preferences are not counted during the count or upon the conclusion of the primary election. *Id*.

37.     In the event of a runoff election, rather than sending UOCAVA voters an additional runoff ballot, the state tabulates the ranked preferences from the initial ranked choice primary ballot and distributes the votes accordingly:

> If a second primary election is necessary, the vote to be counted as cast by each voter shall be the highest designated choice of the voter of the two candidates participating in a contest. The total count of the votes received by each candidate shall be added to the count of votes produced for the candidates pursuant to Section 17-13-18.

Ala. Code § 17-13-8.1(c)(5)(b) (Ex. 1).

38.     UOCAVA voters are not required to rank all the candidates on the ranked choice ballot, but, if they do not rank the entire slate of candidates, their preferences are only tabulated for the candidates they ranked. *Id*. (c)(2). If none of the candidates that the voter ranked advance to the primary, the voter's ranked choice ballot is not counted in the runoff election.

<u>Alabama's Ranked Choice Voting Scheme Disenfranchises Military and Overseas Voters.</u>

39.     Alabama's RCV Scheme disenfranchises military and overseas voters in a number of ways.

40.     First, ranked choice voting creates structural burdens on the right to vote including forcing voters to cast their runoff vote without access to critical political speech available during the valuable time immediately preceding runoff elections; risking non-monotonic elections, *i.e*., elections where a winner can become a loser by gaining more support or a loser can become a winner by losing support;[1] and involving lengthy and complicated ballots which cause voter confusion and imposes the functional equivalent of a literacy—or matrix algebra—test on voters. Second, ranked choice voting suffers from very high rates of "ballot exhaustion" where none of the candidates a voter selected on the ranked choice ballot advance to the runoff election and the voter is denied the ability of casting a new ballot for the runoff election itself.

41.     In addition to harming Plaintiffs and those similarly situated to them directly, these inherent problems also lead to depressed turnout in the initial voting in ranked choice elections. Several studies suggest that ranked choice voting either fails to increase voting turnout relative to plurality or traditional runoff elections or

---

[1]     *See*   The   Center   for   Election   Science,   *Monotonicity*, https://www.electionscience.org/library/monotonicity/ (last visited Dec. 30, 2019).

downright decreases voter turnout in general elections.[2] There is also evidence that ranked choice voting winds up "exhausting" ballots more from minority communities.[3] Under the First Amendment and Due Process Clause of the Fourteenth Amendment, a court considering a challenge to a state election law must carefully balance the character and magnitude of injury to the First Amendment and Due Process rights that the plaintiff seeks to vindicate against the justifications put forward by the state for the burdens imposed by that law. *See Burdick*, 504 U.S. at 434; *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d at 1318-19. "A law that severely burdens the right to vote must be narrowly drawn to serve a compelling state interest. And even when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of

---

[2] *See* RangeVoting, *Instant Runoff Voting Has Not Increased Turnout in San Francisco*, https://rangevoting.org/IRVturnoutSF.html (last visited Jan. 18, 2020); Simon Waxman, *Ranked-Choice Voting Is Not the Solution*, Democracy (Nov. 3, 2016, 3:03 PM), https://democracyjournal.org/arguments/ranked-choice-voting-is-not-the-solution/ (discussing RCV "exhaustion" where large portions of voters fail to cast second- and third-place votes, just like failing to show up to a subsequent runoff election); Craig M. Burnett and Vladimir Kogan, *Ballot (and Voter) 'Exhaustion' Under Instant Runoff Voting: An Examination of Four Ranked-Choice Elections*, 37 Electoral Studies 41 (2015) https://www.sciencedirect.com/science/article/pii/S0261379414001395; James P. Langan, *Instant Runoff Voting: A Cure That Is Likely Worse Than the Disease*, 46 Wm. & Mary L. Rev. 1569, 1591 (2005).

[3] *See* Alexander Holtzman, *The Unanticipated Inequalities of Electoral Reform: Racial and Ethnic Disparities in Voting Behavior under Oakland's Ranked Choice Voting Program*, Political Science Honors Thesis, Professor Clayton Nall, Stanford University (May 4, 2012), available at http://www.hawaiifreepress.com/Portals/0/Article%20Attachments/Racial%20and%20Ethnic%20Disparities%20in%20RCV.pdf?ver=2012-06-25-163017-030; Francis Neely and Jason McDaniel, *Overvoting and the Equality of Voice Under Instant-Runoff Voting in San Francisco*, California Journal of Politics and Policy 7(4) (2015).

sufficient weight still must justify that burden. *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d at 1318-19 (citing *Burdick*, 504 U.S. at 434, *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009)). Essentially "[t]he more a challenged law burdens the right to vote, the stricter the scrutiny to which [the court] subject that law." *Democratic Exec. Comm. of Fla.*, 915 F.3d at 1318-19 (citing *Stein v. Ala. Sec'y of State*, 774 F.3d 689, 694 (11th Cir. 2014)).

42.     The government's seeming interest in the RCV Scheme—its desire to hold the primary and runoff elections as close together as possible—is of minor importance compared to the burdens imposed by RCV, particularly when compared to less burdensome alternatives for complying with UOCAVA, such as providing adequate time between elections and for the return of ballots or faster means for all overseas voters to receive and return an ordinary absentee runoff ballot.

## CLAIMS FOR RELIEF

## COUNT I

**Alabama Prevents Voters From Accessing Vital Information During The Crucial Weeks Between The Primary Election And The Runoff Election In Violation Of The First Amendment's Guarantee Of Free Speech And Association.**

43.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 42, as though fully set forth herein.

44.     Alabama's RCV Scheme creates structural burdens on the right of military and overseas citizens to vote.

45.     Ranked Choice Voting compels individuals to make voting decisions about speculative contests between indeterminate pairs of candidates weeks or even months prior to a runoff election. In that way, it deprives voters of valuable political speech and other clarifying information that becomes available between the initial vote and the runoff election and these voters are denied the ability to make a direct comparison between the two remaining candidates.

46.     In the time between the primary and runoff elections, which is currently four weeks in Alabama, many things could change: new information might come to light about a candidate, some event might change the political landscape, and most importantly of all, a primary field of many candidates will be narrowed to just two candidates. In fields involving larger numbers of candidates, ranked choice may depend on who the opponent will be, and while hypothetical candidate D might be a preferred competitor to frontrunner A, hypothetical candidate E might be preferred over D in a head-to-head race if A unexpectedly fails to make the runoff. In this way, even apart from new political speech and information prior to the runoff, a preliminary ranking of D above E on the initial ballot may not accurately reflect how that voter would vote if given the opportunity to cast a fresh ballot for the runoff election.

47.     The U.S. Supreme Court has observed:

It is well known that the public begins to concentrate on elections only in the weeks immediately before they are held. There are short

> timeframes in which speech can have influence. The need or relevance
> of the speech will often first be apparent at this stage in the campaign.
> The decision to speak is made in the heat of political campaigns, when
> speakers react to messages conveyed by others.

*Citizens United v. FEC*, 558 U.S. 310, 334 (2010). Both the ability to disseminate

this information close in time to an election as well as having access to obtaining

this information is of unrivaled importance. In fact, "[i]t is inherent in the nature of

the political process that voters must be free to obtain information from diverse

sources in order to determine how to cast their votes." *Id*. at 341.

48.     Furthermore, in casting one vote for two elections, "[n]ot only will

voters be required to make the choice from a larger candidate field, they will have

to do so without the clarifying information benefits of a runoff campaign, which

often consists of campaigns working to present stark contrasts between the

remaining two candidates." Jason McDaniel, *Does More Choice Lead to Reduced*

*Racially Polarized Voting? Assessing the Impact of Ranked-Choice Voting in*

*Mayoral Elections*, 10 Cal. J. Politics and Policy 2, 4 (2018),

https://escholarship.org/uc/item/2gm5854x.

49.     The importance of these intervening weeks on voter behavior is

demonstrated by both campaigns' spending behavior and voter participation based

on that expenditure.

> Generally, when more money is spent during the runoff, voter
> participation declines less relative to the initial primary, suggesting that
> a   more   stimulated   political   environment   encourages   greater

participation. Spending before the initial primary is less influential than spending between the primary and runoff in maintaining voter turnout, which indicates that any potential effects from stimulation of the environment in the prior campaign have largely dissipated by the time of the second election.

Charles S. Bullock III, *et al.*, *System Structure, Campaign Stimuli, and Voter Falloff in Runoff Primaries*, The Journal of Politics, Vol. 64, No. 4, 1210 (Nov. 2002). This has been borne out in the real-world examples where turnout increased from primaries to primary runoffs in Alabama[4] and Mississippi,[5] and in general and general runoffs.[6]

50.   Alabama's RCV Scheme denies certain voters crucial information that can only be obtained in the time between the primary election and the runoff. This alone is a severe burden. *See Citizens United*, 558 U.S. at 334 (recognizing that the most important election information comes in the weeks immediately preceding an

---

[4] *See, e.g.*, 2017 U.S. Senate Special election primary and primary runoff in Alabama (*compare* https://www.sos.alabama.gov/sites/default/files/election-2017/Alabama%20Republican%20Party%20-%20Certified%20Results%20and%20Nomination%20of%20Candidates%20for%20Primary%20Runoff%20-%202017-08-25.pdf   *with*   https://www.sos.alabama.gov/sites/default/files/voter-pdfs/2017/repPartyCert-ROResultsGenCand-USSenate-10-10-2017.pdf).

[5] *See, e.g.*, 2014 U.S. Senate primary and primary runoff in Mississippi. *See also* Elaine C. Kamarck, *Increasing Turnout in Congressional Primaries*, Center for Effective Public Management at Brookings (July 2014), https://www.brookings.edu/wp-content/uploads/2016/06/KamarckIncreasing-Turnout-in-Congressional-Primaries72614.pdf.

[6] *See, e.g.*, 2019 Gubernatorial elections in Louisiana (*compare* https://electionstatistics.sos.la.gov/Data/Post_Election_Statistics/Statewide/2019_1012_sta.pdf *with* https://electionstatistics.sos.la.gov/Data/Post_Election_Statistics/Statewide/2019_1116_sta.pdf).

election); *id.* at 341 (recognizing that the ability to obtain information to make informed choices in an election is necessary to the political process). Denying access to information in the weeks preceding the runoff election imposes a severe burden on these certain voters. *Anderson*, 460 U.S. at 791-92, 806; *cf. Kohler v. Tugwell*, 292 F. Supp. 978, 982 (E.D. La. 1968) (three-judge court) (stating that "the state may not mislead its voters to the extent that they do not know what they are voting for or against."), *aff. mem.* 393 U.S. 531 (1969); *Smith v. Cherry*, 489 F.2d 1098, 1100, 1102 (7th Cir. 1973) (finding a complaint sufficiently pleaded civil rights violation where political party officials deceived voters—denied access to full information—in putting forth a candidate who, upon election, was immediately replaced by party officials and had voters known this, they would have voted for a different candidate).

51.     There are less restrictive alternatives that Alabama can implement. Accordingly, Alabama does not have a sufficiently important interest to justify this severe burden. *Burdick*, 504 U.S. at 434; *McCutcheon v. FEC*, 572 U.S. 185, 221-22 (2014) (discussing less restrictive alternatives federal aggregate contribution limits).

## COUNT II

**Alabama' RCV Scheme Imposes A Severe Burden On Plaintiffs' Right To Have Their Votes Counted Reliably Violating The First Amendment Right To Free Speech And Association And The Fourteenth Amendment's Right to Due Process.**

52.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 51, as though fully set forth herein.

53.    Alabama's RCV Scheme contains an inherent risk of non-monotonicity. Non-monotonicity or monotonicity failure occurs when a winner of an election would have lost the election if he or she were ranked higher by a certain subset of voters, or when the loser of an election would have won if he or she was ranked lower by a certain subset of voters. *See* G. Scott Edwards, *Empowering Shareholders, or Overburdening Companies? Analyzing the Potential Use of Instant Runoff Voting in Corporate Elections*, 68 Van. L. Rev. 1335, 1361-63 (2019); Holtzman, *supra* n. 3 at n. 7.[7] Monotonicity failure is inherent in every ranked choice voting scheme and occurs in Alabama's RCV Scheme.

54.    For example, in the 2010 mayoral election in the City of Burlington, Vermont, Progressive candidate Bob Kiss won the election under the city's rank choice voting regime. After rank choice voting eliminated several other candidates, the final three candidates were: Bob Kiss (P); Kurt Wright (R); Andy Montroll (D).

---

[7] Adam Crepeau and Liam Sigaud, *A False Majority: The Failed Experiment of Ranked-Choice Voting*, The Maine Heritage Policy Center, 20-23 (Aug. 2019), https://mainepolicy.org/wp-content/uploads/RCV-Final-Booklet-.pdf.

55.     After the first round of balloting, the number of voters ranking candidates first looked like this: Wright (R): 3,297; Kiss (P): 2,982; Montroll (D): 2,554.

56.     Because in the runoff portion of balloting, only the top two candidates advance, Montroll was eliminated.[8] Once this occurred, Kiss won the election with 51% of the vote.[9] How did this occur? Particularly, when given the choice between Montroll and Kiss, 54% preferred Montroll and when given the choice between Wright and Montroll, 56% preferred Montroll.[10]

57.     Furthermore, Kiss won because, ironically, not enough people ranked him first. By a substantial margin, those who voted for Wright preferred Montroll to Kiss by a 3:1 margin.[11] Bizarrely, if 750 people who ranked Wright first, Montroll second, and Kiss third had reversed their ranking, i.e., Kiss first, Montroll, second, and Wright third, then Montroll would have beaten Kiss, despite 750 more people ranking Kiss first.[12]

---

[8] Joseph T. Ornstein and Robert Z. Norman, *Frequency of monotonicity failure under Instant Runoff Voting: estimates based on a spatial model of elections.* Public Choice 161:1-9 at 2 (2014).

[9] *Id*.

[10] *See id*; *see also* Anthony Gierzynski, *et al., Burlington Vermont 2009 IRV Mayor Election: Thwarted-majority, Non-monotonicity & Other Failures (oops),* RangeVoting (March 2009), https://www.rangevoting.org/Burlington.html (last visited Jan. 18, 2020).

[11] *See* Ornstein and Norman, *supra* note 8 at 2 (table 1); *see also* Gierzynski*, et al. supra* note 10.

[12] Ornstein and Norman, *supra* note 8 at 3.

58.     Non-monotonic elections are unfair and unrepresentative. A voter who is not aware of the non-monotonicity problem, or lacks the information needed to assess the danger in any event, may unknowingly tip the scales in favor of his or her disfavored candidate by voting for his or her favored candidate. Even a voter aware of the non-monotonicity problem and the relevant underlying data may be compelled to vote for his or her least favored candidate in order to advance the favored candidate, or else not vote at all.

59.     This structural problem in Alabama's RCV Scheme creates voter confusion and a substantial burden on voting. In non-ranked choice elections, the choice facing voters is simple: of all the candidates on the ballot, whom do you prefer? Ranked choice voting is much more complicated, and much different from the voting methods voters have been used to using in the past. Ranked choice elections require substantially more information than plurality elections, and most voters do not possess the necessary information to complete the ranked choice ballot in a way that accurately benefits their preferred candidate or candidates. Indeed, the complexity of RCV and the requirement to make head-to head comparisons of every possible permutation of candidates in order to determine ranking most resembles forbidden literacy tests, or perhaps, here, matrix algebra tests.

60.     This complexity of ranked choice voting's non-monocity leads to not only general voter confusion, but also to greater numbers of spoiled or "exhausted"

ballots, *see supra*, and reduced voter turnout even for the initial election, not unlike other arbitrary or discriminatory barriers to entry such as literacy tests or poll taxes.

61. Alabama's RCV Scheme violates the First Amendment because it, much like Vermont's scheme, allows the disfavored candidate to win the election. The way Alabama counts these votes does not accurately reflect the will of the people, violating rights guaranteed under the First Amendment and the Due Process Clause of the Fourteenth Amendment. Alabama's RCV Scheme is therefore fundamentally flawed.

62. The First and Fourteenth Amendments to the U.S. Constitution protect the right to vote and to have that vote properly counted. "[A]ll qualified voters have a constitutionally protected right to vote . . . and to have their votes counted. *Reynolds v. Sims*, 377 U.S. 533, 554 (1964). The right to vote "can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Id*. at 555. At its most foundational, the right to vote includes the right to "vote freely for the candidate of one's choice." *Id*. (emphasis added).

63. When a vote is not reliably counted, "[d]ue process, representing a profound attitude of fairness between man and man, and more particularly between individual and government, is implicated in such a situation." *Curling v. Raffensperger*, 397 F. Supp. 3d 1334, 1404 (N.D. Ga. 2019) (quoting *Duncan v.*

*Poythress*, 657 F.2d 691, 703 (5th Cir. 1981)).[13] The rights protected under the Due Process Clause of the Fourteenth Amendment extend not just to the initial allocation of the right to vote, but also to the manner of exercising the right to vote. *See Bush v. Gore*, 531 U.S. 98, 104-105 (2000).

64.   "Just as the equal protection clause of the fourteenth amendment prohibits state officials from improperly diluting the right to vote, the due process clause of the fourteenth amendment forbids state officials from unlawfully eliminating that fundamental right." *Duncan*, 657 F.2d at 704. "It is well established that when a state accords arbitrary . . . treatment to voters, those voters are deprived of their constitutional right[] to due process . . . ." *Curling*, 397 F. Supp. 3d at 1404 (citing *Bush v. Gore*, 531 U.S. at 107).

65.   There are less restrictive alternatives that Alabama can implement. Accordingly, Alabama does not have a sufficiently important interest to justify this severe burden. *Burdick*, 504 U.S. at 434; *McCutcheon*, 572 U.S. at 221-22 (2014) (discussing less restrictive alternatives federal aggregate contribution limits).

### COUNT III

**Alabama' Ranked Choice Voting Regime Imposes A Severe Burden On Plaintiffs' Right To Vote Because A Substantial Portion Of The Electorate Exhaust Their Ballots, Nullifying Their Vote, In Violation Of The First**

---

[13] All decisions of the United States Court of Appeals for the Fifth Circuit issued before close of business on September 30, 1981 are binding on the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*) (adopting the decisions of the 5th Circuit as of close of business on September 30, 1981, as binding precedent in the Eleventh Circuit). *Duncan* was decided on September 28, 1981 and is therefore binding precedent.

**Amendment Right To Free Speech And Association And The Fourteenth
Amendment's Right To Due Process.**

66.     Plaintiffs reallege and incorporate by reference paragraphs 1 through
65, as though fully set forth herein.

67.     Alabama's RCV Scheme also violates the First and Fourteenth
Amendments because, by exhausting a high percentage of ballots, it severely
burdens the right to vote, which "is of the most fundamental significance under our
constitutional structure." *Burdick*, 504 U.S. at 433.

68.     Ballot exhaustion denies a large number of RCV voters the right to
vote. If a voter's choice of candidates is eliminated, her votes have no force or effect
on subsequent runoff election(s). Studies have shown that in RCV elections,
anywhere from approximately 10% to over 27% of all RCV votes are exhausted
prior to the runoff election. *See* Barber Affidavit at 9-10 (attached to Original
Complaint as Exhibit 4); Burnett and Kogan, *supra* n. 2 at 46.[14]

69.     This means that in some elections, over a quarter of all those who
submitted ranked choice ballots had no say whatsoever in the final round of vote
redistribution deciding the election outcome. *Id*. In fact, after examining 96 ranked-
choice voting races across the nation, one study found that an average of 10.92% of

---

[14] *See also* Cook, *et al., Ranked Choice Voting in the 2011 San Francisco Municipal Election:
Final     Report*,     McCarthy     Center     Faculty     Publications     (2011),
http://repository.usfca.edu/mccarthy_fac/2.

all RCV ballots cast were exhausted by the final round of tabulation. *See* Crepeau and Sigaud, *supra* n. 7 at 20-23. RCV races can and have created more exhausted ballots than ballots actually awarded to the winner of an election. *See id*. at 9-10 ("the 2010 election for San Francisco's Board of Supervisors in District 10 resulted in 9,608 exhausted ballots whereas the prevailing candidate only received 4,321 votes.") (citing Official Ranked-Choice Results Report November 2, 2010 Consolidated Statewide Direct Primary Election Board of Supervisors, District 10, City of San Francisco (2011), https://sfelections.org/results/20101102/data/d10.html).

70.    The ballot exhaustion rate in RCV elections is so high in fact that many winning candidates do not even win with a true majority of the total votes cast— which is the very reason for runoff elections and required under Alabama law. *Id*.; Ala. Code § 17-13-18(b); Barber Affidavit at 9-10 (Ex. 4). In addition, evidence exists showing that ballot exhaustion is higher in minority and elderly communities. *See* Holtzman, *supra* n. 3; Neely and McDaniel, *supra* n. 3.

71.    "Obviously included" within the right to vote "is the right of qualified voters within a state to cast their ballots and have them counted." *United States v. Classic*, 313 U.S. 299, 315 (1941); *Stewart v. Blackwell*, 444 F.3d 843, 856-57 (6th Cir. 2006) (same); see also 52 U.S.C. § 10310(c)(1) (defining right to vote as

including "casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast").

72.     The discarding of potentially thousands of military and overseas ballots, based on the votes they cast in a previous election, unquestionably imposes a severe burden on the constitutional right to vote. *See Fla. Democratic Party v. Detzner*, No. 16-cv-607, 2016 U.S. Dist. LEXIS 143620 at *20 (N.D. Fla. Oct. 16, 2016) ("If disenfranchising thousands of eligible voters does not amount to a severe burden on the right to vote, then this Court is at a loss as to what does."). In the context of voting rights cases, "even one disenfranchised voter—let alone several thousand—is too many[.]" *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014), *cert. denied*, 135 S. Ct. 1735 (2015). For example, in *Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580 (6th Cir. 2012), the court held that disqualification of thousands of Ohio provisional ballots because they were cast in the right polling location but wrong precinct in multiple precinct polling locations constituted a "substantial" burden on provisional voters. *Id*. at 597. The court reached this conclusion even though such ballots historically constituted less than 0.248% of all votes cast. *Id*. at 593. *See also Cherry*, 489 F.2d at 1100, 1102 (where a candidate conspired with political party officials to run as a "stand-in" candidate during a primary, but had no intention of running in the general election and then dropped out after the primary to make way for a candidate supported by the

party officials, voters who voted for the stand-in candidate believing they were voting for the party's nominee for the general election suffered an "impermissible" "abridgment of the[ir] right to vote").

73.     Alabama's burden on voting is not justified or outweighed by its supposed interests. Alabama could easily comply with UOCAVA by extending the return time for UOCAVA ballots, thereby allowing overseas voters, like Plaintiffs, to cast a second ballot. And its interest in having a shorter turnaround time between primary and runoff elections is not even remotely significant enough to warrant deprivation of voting rights. Accordingly, since a less constitutionally burdensome alternative exists, the RCV Scheme is not narrowly tailored and fails constitutional muster under the First and Fourteenth Amendments. *See McCutcheon*, 572 U.S. at 221-22 (discussing less restrictive alternatives federal aggregate contribution limits); *Cal. Democratic Party*, 530 U.S. at 585-86.

74.     Accordingly, Plaintiffs are deprived of their civil rights under color of state law in violation of 42 U.S.C. §1983 and 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

(1)     Declare Alabama's RCV Scheme, Ala. Code § 17-13-8.1, unconstitutional and invalid;

(2)     Enjoin Defendants and their employees and agents from administering Alabama's RCV Scheme;

(3)     Order Defendants to send UOCAVA voters separate ballots for the runoff election in a manner that is compliant with UOCAVA's 45-day requirement; 52 U.S.C. § 20302(a)(8)(A);

(4)     In the alternative, order Defendants to send UOCAVA voters separate ballots for the runoff election but provide these voters with additional time to transmit their ballots back to the appropriate authorities in Alabama. Additionally, Defendants must obtain a waiver under UOCAVA's hardship exemptions. 52 U.S.C. § 20302(g)(2)(B)(i);

(5)     Award Plaintiffs their costs and reasonable attorneys' fees, and litigation expenses incurred in bringing this action;

(6)     Grant further relief as this Court deems just and proper.

Respectfully submitted February 26, 2020,

/s/ Matthew R. Jackson
Matthew R. Jackson (JACKM7882)
C. Britton Bonner (BONNC0122)
ADAMS AND REESE LLP
11 N. Water Street, Suite 23200
Mobile, Alabama 36602
(251) 433-3234 (Phone)
(251) 438-7733 (Fax)
britton.bonner@arlaw.com
matt.jackson@arlaw.com
*Counsel for Plaintiffs*

Jason B. Torchinsky*
Jonathan P. Lienhard*
Shawn Sheehy*
Dennis W. Polio*
HOLTZMAN VOGEL JOSEFIAK
TORCHINSKY, PLLC
45 North Hill Drive, Suite 100
Warrenton, VA 20186
(540) 341-8808 (Phone)
(540) 341-8809 (Fax)
Jtorchinsky@hvjt.law
Jlienhard@hvjt.law
Ssheehy@hvjt.law
Dwpolio@hvjt.law
*pro hac vice applications pending
Counsel for Plaintiffs

Erik S. Jaffe*
SCHAERR-JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
 (202) 787-1060 (Phone)
ejaffe@schaerr-jaffe.com
*pro hac vice application to be filed
Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing has been filed this 26th day of February 2020 using the CM/ECF system which instantaneously sent a Notice of Electronic Filing (NEF) to all counsel required to be served.

/s/ Matthew R. Jackson
Matthew R. Jackson