IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA

MIRNA MICHEL JABBOUR, and )
NATIONAL DEFENSE COMMITTEE, )
)
    Plaintiffs, )
)
v. )     Case No. 1:20-cv-00034-JB-N
)
JOHN H. MERRILL, in his official capacity )
as Secretary of State, *et al.*, )
)
    Defendants. )

**STATE DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS**

The State Defendants—Secretary of State John H. Merrill, the Board of Registrars for Mobile County, Board Chair Motlow, and Board Members Callaghan and Reams—reply in support of their motion to dismiss as follows.[1]

**I. PLAINTIFFS LACK STANDING.**

**A.  Plaintiff Jabbour lacks standing.**

Plaintiff Jabbour lacked standing at the time that the complaint in this action was filed, as set out in the motion to dismiss. **Doc. 27, PageID.485-486.** Remarkably, Plaintiffs argue that she nonetheless sufficiently *pled* that she had standing. **Doc. 33, PageId.604.** That is irrelevant. The State Defendants brought a factual challenge to Plaintiff Jabbour's standing and demonstrated that, as a matter of fact, she could not suffer the injuries she feared because she had failed to request a ballot for the primary election of either political party and, as a result, had been sent a non-partisan

---

[1]     Despite Plaintiffs' new-found aim at the State of Alabama itself, *see e.g.,* **Doc. 33, PageID.603** (encouraging an injunction against the State), the State is not a defendant in this litigation and it has sovereign immunity as to the claims. U.S. Const. Amend. XI. It is Plaintiffs' burden to identify and sue the correct defendants, and the State Defendants reserve the right to argue, should they deem it appropriate, that necessary parties have not been brought before this court.

ballot which did not contain any candidates to rank.   **Doc. 27, PageID.483-485.**   At that point, it was incumbent on the Plaintiffs to offer facts to show that the State Defendants were mistaken. Instead, they confirmed that she had not requested the Republican primary ballot she desired, though they attempted to cast blame for that on the State.   **Doc. 28-1, PageID.509-512.** Irrespective of why Plaintiff Jabbour failed to request the Republican primary ballot, the undisputed fact is that, at the time she filed this litigation, she had on file with the local election officials an application for an absentee ballot that had been processed for a non-partisan, non-ranked ballot.  **Doc. 27, PageID. 485-486; Doc. 24-2, PageID.177-178; Doc. 28-1, PageID.509-512.**

Since then, Plaintiff Jabbour has filed a declaration indicating that she would "complet[e] and submit[] a new UOCAVA Application for Absentee Ballot," **Doc. 28-1, PageID.510**, and a subsequent declaration that she had done so, **Doc. 33-1, PageID.623.**   Plaintiffs seek leave to file a supplemental complaint that will explain Plaintiff Jabbour's alleged confusion in completing her original application for an absentee ballot and set out the fact that she has submitted a correct application.  **Doc. 32-1, PageID.570-71.**   They assume as a factual matter that Plaintiff Jabbour has received a ranked Republican ballot for her use in yesterday's primary election and any primary runoff election. **Doc. 32, PageId.558.**

The motion to dismiss is aimed at the original complaint, which was the only complaint filed at the time the dispositive motion was filed and which remains the operative complaint. Plaintiff Jabbour failed to originally apply for a partisan absentee ballot, and so was transmitted a ballot with no candidates to rank.  **Doc. 27, PageID.485-486.**  Thus, as a factual matter, she lacked standing at the time that the complaint was filed.  **Doc. 27, PageID.485-486.**  This has not changed,

and it requires dismissal of her claims. *Alabama v. U.S. Army Corps of Engineers*, 382 F. Supp. 2d 1301, 1316 (N.D. Ala. 2005).

Even if this court were to consider whether, as a factual matter, Plaintiff Jabbour would have had standing to file this litigation at the time she submitted her proposed supplemental complaint, she did not. As set out in the State Defendants' opposition to the motion to file that complaint, Plaintiff Jabbour did not receive a ranked ballot allowing her to participate in yesterday's Republican primary election. **Doc. 37, PageID.682;** *see also* **Doc. 36-1, PageID.669.**

**B. Plaintiff National Defense Committee lacks standing.**

In response to the State Defendants' facial attack on the National Defense Committee's lack of standing, **Doc. 27, PageID.486-487,** Plaintiffs allege that the NDC has standing based on an injury to itself, and note that the State Defendants incorrectly surmised that the NDC was trying to bring its claims on behalf of members, **Doc. 33, PageID.606.** The State Defendants' confusion is to be forgiven as the Plaintiffs failed to include sufficient allegations of injury to the NDC in the original complaint. **Doc. 1, PageID.2, 5-6;** *see also* **Doc. 1-3, PageID.32-34.** They admit as much by including such allegations in their proposed supplemental complaint, **Doc. 32-1, PageID.572-573,** and in a new declaration from the NDC's Executive Director, **Doc. 32-1, PageID.630-631.**

Plaintiffs insist that they have cured the standing issues for the NDC. They are wrong. The supplemental complaint has not been filed; it has only been proposed. **Doc. 32, PageID.557-561.** The motion to dismiss is aimed at the original complaint, which was the only complaint filed at the time the dispositive motion was filed and which remains the operative complaint. And it remains true that the NDC has failed, in that original complaint, to make sufficient allegations to support standing. **Doc. 27, PageID.486-487.** While the allegations were so deficient that the State Defendants mistook the type of standing that the NDC intended to assert, the fact remains that

3

operative complaint is defective on jurisdictional grounds, and this court must not allow it to stand. *Cf. Bochese v. Town of Ponce Inlet,* 405 F.3d 964, 975 (11th Cir. 2005) ("A necessary corollary to the concept that a federal court is powerless to act without jurisdiction is the equally unremarkable principle that a court should inquire into whether it has subject matter jurisdiction at the earliest possible stage in the proceedings.  Indeed, it is well settled that a federal court is obligated to inquire into subject matter jurisdiction *sua sponte* whenever it may be lacking.") (internal citation and quotation marks omitted).

The motion to dismiss is due to be granted as to the NDC.  Should this court decide to grant Plaintiffs leave to file a supplemental complaint, the State Defendants should be permitted to plead, as envisioned by Fed. R. Civ. P. 15(d).[2]

## II.  PLAINTIFFS' CLAIMS ARE MERITLESS.

The State Defendants set out the *Anderson-Burdick* test for considering Plaintiffs' three Counts and argued that, to the extent the *Anderson-Burdick* test is at play, as to each of the Counts, Alabama has imposed a minimal burden (if any burden at all) and that burden is fully justified by the State's interest in complying with UOCAVA's 45-day rule while protecting the interests of all voters and candidates and maintaining a single primary runoff election date on a non-extended schedule.  **Doc. 27, PageID.493-495.**  The State Defendants set out at length the State's interests

---

[2]     It is noteworthy that associational standing pursuant to *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333 (1977), would be significantly more appropriate in this litigation—if it applied to the NDC—as the NDC is essentially trying to step into the shoes of the voters and assert claims for them.  The State Defendants fully recognize that *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), has prompted binding precedent like *Florida State Conference of the NAACP v. Browning*, 522 F.3d 1153 (11th Cir. 2008), *Common Cause/Georgia v. Billups,* 554 F.3d 1340 (11th Cir. 2009), and *Georgia Latino Alliance for Human Rights v. Governor of Georgia*, 691 F.3d 1250 (11th Cir. 2012).  To the extent that these decisions would authorize the NDC to assert the First Amendment and Due Process claims in this case, the decisions are wrong.  Should this litigation continue, the State Defendants expect to press this issue in the appropriate courts.

in requiring UOCAVA voters to cast ranked ballots if they want to participate in the primary election and the primary runoff election for Congressional candidates.  **Doc. 27, PageID.476-477, 479-482, 494-495.**  And we explained why the burden on the Plaintiffs was minimal or non-existent.  **Doc. 27, PageID.495-505.**  Thus, contrary to Plaintiffs' assertion that the State Defendants failed to argue there was no substantial burden to Plaintiffs' rights, **Doc. 33, PageID.600,** we made exactly that argument.

### A. Plaintiffs' claim that Alabama's use of ranked choice ballots violates their First Amendment rights is meritless because any burden is slight and fully justified by the State's weighty interests.

Count I alleges that the Plaintiffs are deprived of their First Amendment rights when Alabama has designed her voting system to enable them to vote in the primary election and the primary runoff election simultaneously because doing so means that they will miss out on information that may (or may not) emerge before the primary runoff election occurs at the polls (if one is needed).  Plaintiffs specifically do not bring an Equal Protection challenge. **Doc. 1, PageID.13-16.**

The Supreme Court has explained that ". . . States have enacted comprehensive and sometimes complex election codes. Each provision of these schemes, whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends. Nevertheless, the [S]tate's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions." *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983) (footnote omitted).  As a result, a case like this one "cannot be resolved by any 'litmus-paper test'" but instead requires a fact-specific analysis of the burdens at issue and the State's asserted interests in creating the system that imposed those

burdens.  *Id.* at 789.  Plaintiffs have offered the court no cases directly on point for the interests they assert, and they have dismissed out-of-hand the State's important interests.  **Doc. 33, PageID.599-600, 608-614;** *see also* **Doc. 1, PageID.8.**

Plaintiffs do improperly characterize their burden as "disenfranchisement." *See e.g.,* **Doc. 1, PageID.10, Doc. 1-2, PageID.30; Doc. 1-3, PageID.34; Doc. 33, PageID.600.**  It is not disenfranchisement to enable UOCAVA voters to fully participate in the election process in a different manner than the one used by other voters.  UOCAVA voters are permitted to cast their ballots and have them counted.  Ala. Code § 17-13-8.1; Ala. Admin. Code § 820-2-10-.18 (*available at* **Doc. 24-14, PageID.303-309**); **Doc. 27, PageID.499-502.**  They simply participate in the process differently because of requirements that federal law places on the States in recognition of the distances and difficulties in reaching some UOCAVA voters.  52 U.S.C. § 20302(a)(8)(A) (UOCAVA's 45-day rule); *see also* **Doc. 24-5, PageID.192.**

That distinction is one reason why *Anderson v. Celebrezze* is distinguishable.  In that case, the question was whether John Anderson should be on the presidential ballot at all, 460 U.S. at 782-83, not about the manner in which he would be included in the election.  With respect to timing, the Court noted that Ohio's petition filing deadline was five months before the Democrats and Republicans would have their conventions to select their nominees and adopt their platforms. 460 U.S. 790-91.  By contrast, we deal with a primary election scheduled for four weeks before the primary runoff election.  Ala. Code § 17-13-3; Ala. Code § 17-13-18(b).  And, of course, the analysis on the other side of the equation—Ohio's interests in its early petition deadline—was also different and cannot be simply transferred to this case.  Indeed, Alabama's own early deadline for petitioning for ballot access for political parties who wanted their party label attached to their

presidential candidates has been upheld.  *Stein v. Alabama Secretary of State*, 774 F.3d 689 (11th Cir. 2014).

Plaintiffs' point that voters benefit from information beyond what is on the candidate's website is well-taken, **Doc. 33, PageID.609,** but that information and other information is available to UOCAVA voters to utilize in making their choices.  Insofar as the First Amendment is concerned, Plaintiffs do not have a right to demand that the election be scheduled at a particular time in order to maximize the information available to them or the events that will have transpired before they make their choices.  Moreover, with the limited exception of voters permitted to cast their ballots electronically, *see* **Doc. 24-2, PageID.172;** Ala. Code §§ 17-11-40 *et seq.,*  there is inherently a need for absentee voters to cast and transmit their ballots before voters who appear at the polls make their choices.  What this claim boils down to is the fact that Alabama has extended that time somewhat—for those UOCAVA voters who wish to participate in both the primary election and any primary runoff election—and it has done so for good and weighty reasons.  How long the extension is probably varies by the situation of the individual voter.  Moreover, contrary to the assumptions of Plaintiffs' expert, **Doc. 33-3, PageID.645**, there is no reason that a UOCAVA voter—like any other voter—cannot skip the primary in order to maximize his participation in the runoff election.  **Doc. 27, PageID.501; Doc. 36-1, PageID.670.**  Indeed, it would not be unheard of for a voter to skip a primary election in order to have the flexibility to participate in whichever primary runoff election is more important to him, in light of the anti-crossover rule in Ala. Code § 17-13-7.1.

In support of their argument that it is critical they have access to the information developed between the primary election and any primary runoff election, and citing Professor Barber, Plaintiffs contend that "it is not surprising that turnout actually increases in runoff elections

compared to the primary election." **Doc. 33, PageID.609.** Actually, it is surprising. Professor Barber's own analysis demonstrates that 80% of the Gubernatorial and United States Senate races that he considered did not even require a runoff election. **Doc. 33-3, PageID.644.** And, in those few elections that did go a runoff, turnout usually declined: specifically, turnout declined 79% of the time in the Gubernatorial elections that Professor Barber studied and 91% of the times in the Senate races he studied. **Doc. 36-2; PageID.677-678;** *see also* **Doc. 33-3, PageID.644-645.** By contrast, ranked choice voting may raise turnout. **Doc. 25-1, PageID. 455; Doc. 36-2; PageID.677.** And, as the State Defendants developed at length in their original motion to dismiss, the ranked choice ballots were adopted to include the UOCAVA voters in the election process as an alternative to an extended runoff schedule. **Doc. 27, PageID.476-483.**

Plaintiffs have not shown that their First Amendment rights are severely burdened by the requirement that they cast a ranked ballot if they want to participate in the primary election and the primary runoff election for Congressional candidates. Any burden is minimal. Thus, it "trigger[s] less exacting review" and Alabama's "important regulatory interests," are sufficient to justify it. *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (internal citations and quotation marks omitted).

### B. Plaintiffs' claim that Alabama's ranked choice voting scheme risks non-monotonicity is meritless and they lack standing to bring it.

Count II alleges that "Alabama's RCV Scheme contains an inherent risk of non-monotonicity," which Plaintiffs understand to result in the *wrong* person winning an election. **Doc. 1, PageID.16.** But the "RCV Scheme" Plaintiffs attack is one where the failure of a candidate to secure a majority in the first round of voting leads to one or more additional rounds wherein the lowest ranking candidate is dropped and his votes reallocated—all in an election where all of the voters are participating in this same "RCV Scheme." **Doc. 1, PageID.16-18;** *see also* **Doc. 1-4,**

8

**PageID.41-44, 48-51.**   That description does not fit Alabama's laws, and thus Plaintiffs' attack misses its mark.  *Cf.* **Doc. 25-1, Page ID.439-445, 452-453.**

Plaintiffs first respond by mischaracterizing the State Defendants' arguments and suggesting we do not care about UOCAVA voters.  **Doc. 33, PageID.614-616.**  In fact, the State Defendants have been arguing that non-monotonicity cannot happen in Alabama's elections because of the differences between Alabama's system and the one that Plaintiffs and their expert describe and analyze.  **Doc. 27, PageID.499-502; Doc. 25-1, PageID.452-453; Doc. 36-2, PageID.676-677.**  Brought into focus, what the State Defendants have been saying all along is that Plaintiffs' assertion that an Alabama election will suffer a monotonicity failure is entirely speculative (as well as groundless).  As a result, Plaintiffs have not just failed to state a claim; but, additionally, their injury is speculative, and thus they are without standing to bring the claim, *Lujan v. Defendants of Wildlife*, 504 U.S. 555, 561 (1992); *City of Miami Gardens v. Wells Fargo & Co*., 931 F.3d 1274, 1282 (11th Cir. 2019).

While that should be the end of the Count and the matter, a few additional points require response.  First, Plaintiffs say that "Ms. Jabbour has alleged that Alabama's RCV regime does not properly count *her* vote."  **Doc. 33, PageID.616** (emphasis added).  What she alleged was the potential for a systematic failure, **Doc. 1, PageID.18-19**—that is, systematic failure of a system different from Alabama's.  *Cf. Crist v. Comm'n on Presidential Debates*, 262 F.3d 193, 195 (2d Cir. 2001) (finding no "injury-in-fact when the alleged hard is abstract and widely shared").  Moreover, in light of how Alabama's system actually works—which involves looking at the ballot to see which primary runoff election candidate is highest ranked, **Doc. 27, PageID.501-502**—Plaintiff Jabbour has not plausibly pled that some election worker in Mobile County would be

confused about how to count her ballot in the Republican primary runoff election, *if* she were voting in that election.

Next, Plaintiffs say that they have plausibly pled that non-monotonicity could happen, after-all it happened once in a mayoral election in Burlington, Vermont, where 750 votes made the difference. **Doc. 33, PageID.616-617.** Even if it did happen once in a mayoral election in Vermont, that does not mean that Plaintiffs have plausibly pled it could happen in an Alabama Congressional election, for all the reasons discussed at length in our motion to dismiss and in the expert reports of Quinten Kidd. **Doc. 27, PageID.499-503; Doc. 25-1, PageID.439-445, 452-453; Doc. 36-2, PageID.671-673, 676-677.**

Indeed, Plaintiffs' attempt to point out that the 750 votes at issue in Burlington, Vermont is not many more than the 500 UOCAVA ballots that had been transmitted by mid-February, **Doc. 33, PageID.616-617,** is laughable. We are talking about the difference between all voters and fewer than one percent of voters casting ranked ballots, **Doc. 1, PageID.17; Doc. 27, PageID. 482-483, 499-500; Doc. 25-1, PageID.453; Doc. 36-2, PageID.677** as well as the difference between a mayoral race and a race for the United States House of Representatives or the United States Senate. As to the latter point, it is not raw numbers that matter, but percentages.[3] And the percentage of ranked ballots at issue in Alabama's Congressional races is tiny. **Doc. 27, PageID. 499-500; Doc. 25-1, PageID.453; Doc. 36-2, PageID.677.** Again, that doesn't mean that the State

---

[3]    According to the United States Census Bureau's website, Burlington, Vermont had a 2010 population of 42,417. QuickFacts for Burlington city, Vermont, *available at* https://www.census.gov/quickfacts/burlingtoncityvermont (*last visited* March 4, 2020). According to the same website, Alabama's 2019 population was 4,903,185. QuickFacts for Alabama, *available at* https://www.census.gov/quickfacts/AL (*last visited* March 4, 2020). Even reduced to a United States House race—as opposed to a statewide race for United States Senate— there should be approximately 700,000 people in each of Alabama's Congressional Districts. That is more than fifteen times the size of the City of Burlington in 2009.

Defendants do not care about these voters; it means that the Plaintiffs' assertions of injury are entirely speculative.

Relatedly, Plaintiffs rely on Professor Barber's reporting that Ornstein and Norman demonstrated that "simulated elections exhibit monotonicity failure in anywhere from 0.7% to 51% of all cases." **Doc. 33-3, PageID.642,** *relied on at* **Doc. 33, PageID.617.** As Dr. Kidd explains, the "[t]here is a robust debate in the academic literature as it related to non-monotonicity in ranked choice elections." **Doc. 25-1, PageID.452.** But, even if the scholars were settled, the analysis here is of "simulated elections," **Doc. 33-3, PageID.642;** *see also* **Doc. 36-2, PageID.676,** not real Alabama elections. And Professor Barber makes no attempt to demonstrate that the simulated elections were simulated according to the rules at play in Alabama, instead of the generic model he describes in his report, **Doc. 1-4, PageID.41-44. Doc. 1-4, PageID.40-52; Doc. 33-3, PageID.635-646.**

Plaintiffs' concerns that Alabama will hold a non-monotonic election are entirely meritless, and their injuries speculative. This Count is due to be dismissed.

### C. Plaintiffs' claim that ranked choice voting leads to ballot exhaustion is meritless and they lack standing to bring it.

Count III alleges that Plaintiffs are "sever[ly] burden[ed] . . . because a substantial portion of the electorate exhaust their ballots, nullifying their vote." **Doc. 1, PageID.20** (bold and capitalization omitted). As the State Defendants set out in their motion to dismiss, there are two fundamental problems with this argument. First, like much of the complaint, it is grounded in a failure to address how Alabama uses ranked choice ballots. Second, it is focused on the rights of parties not before the court, which raises additional standing concerns. **Doc. 27, PageID.503-505.**

With respect to the second argument, Plaintiffs contend that they are invoking only their own rights. **Doc. 33, PageID.620.** While it is entirely appropriate for them to essentially concede

that they cannot raise the rights of non-parties in this litigation, Count III of the complaint does exactly that. **Doc. 1, PageID.20-22.** For instance, beyond the title of Count III, which is quoted in the last paragraph, Paragraph 57 of the complaint alleges "a high percentage of ballots" are exhausted and Paragraph 58 alleges "[b]allot exhaustion denies a large number of RCV voters the right to vote." **Doc. 1, PageID.20.** Accordingly, the State Defendants' arguments are well taken.

On the merits, Plaintiffs' theory of ballot exhaustion is based on their description of a ranked choice voting system where there are multiple rounds of balloting, with candidates dropped at each round and votes reallocated. *See e.g.,* **Doc. 1, PageID.17, 20-22; Doc. 1-4, PageID.46-48.** This is not how ranked choice voting works in Alabama. Instead, the ranked ballots allow the UOCAVA voter to rank as many of the candidates as she wishes. The highest ranked candidate receives the vote in the primary election, and the highest ranked candidate to reach the primary runoff election receives the vote for that election. It is within the discretion of each voter whether to rank beyond the first choice. **Doc. 27, PageID.501-502.** Plaintiffs say that counting the highest ranked candidate participating the primary runoff election is the same as reallocating votes, since that candidate may not have been the first choice of the voter. **Doc. 33, PageID.618-619.** That may well be true, but the election is otherwise not "exactly the same" as Burlington, Vermont's election, **Doc. 33, PageID.619.**

Alabama's UOCAVA voters have the option of ranking as many or as few of the candidates in the primary election as they desire. **Doc. 27; PageID.501-502.** If they have left un-ranked both of the candidates who reach any primary runoff election, then it is true that their ballot will not be counted in that election. **Doc. 27; PageID.501-502.** But Alabama has not denied them the opportunity to rank those candidates, and their burden in doing so at the primary election is minimal and fully justified by the State's important interests.

Professor Barber says that "the possibility of unranked candidates remains significant" in Alabama's Republican election for United States Senate.  **Doc. 33-3, PageID.637.**  First, his report fails to meet the standard set in Fed. R. Civ. P. 26(a)(2)(B)(i) in that he has failed to express the basis for his opinion.  Second, as a practical matter, and meaning no disrespect to the candidates, it is hard to believe that most voters did not know which four of the seven candidates stood the highest chances of reaching the primary runoff election, and it is only necessary to rank one of the candidates to reach that election for the vote to be counted.  Saying there are seven candidates in no ways demands that the likelihood of ballot exhaustion is anything close to significant.  And, third, this analysis again feeds into the idea that Plaintiff can suffer some sort of injury based on what other voters do.  It is within each UOCAVA voter's discretion which candidates to rank and how to rank them (so long as a they are ranked sequentially), and it no more harms Plaintiffs that some voters did not rank the primary runoff candidates than it harms them that some voters supported different candidates than they do.

Accordingly, Plaintiffs' reminders of the undisputed importance of the vote and of the need to count legally-cast ballots, *see e.g.,* **Doc. 33, PageID.620** (*citing United States v. Classic*, 313 U.S. 299 (1941)), are beside point.  UOCAVA voters choosing to participate in the primary election and any primary runoff election may do so by completing a ranked choice ballot, which enables that participation in compliance with federal law's 45-day requirements, 52 U.S.C. § 20302(a)(8)(A).  **Doc. 27, PageID.501-502.**  UOCAVA voters are not required to rank more than one candidate, and their ballots are not rejected for failure to rank all candidates.  **Doc. 27, PageID.501-502.**  If a UOCAVA voter declines to rank the two candidates who ultimately reach any primary runoff election, then that voter's ballot is not counted based on that voter's decision.

Thus, the burden imposed on the Plaintiffs, if any, is minimal and fully justified by the State's important interests.

## VI. CONCLUSION

For the foregoing reasons and the reasons set out in the original motion to dismiss, this court lacks jurisdiction to consider Plaintiffs' claims and the claims are meritless.  The case is due to be dismissed.

Respectfully Submitted,

Steve Marshall
  *Attorney General*

s/Misty S. Fairbanks Messick
Winfield J. Sinclair (ASB-1750-S81W)
Misty S. Fairbanks Messick (ASB-1813-T71F)
*Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Post Office Box 300152
Montgomery, Alabama 36130-0152
telephone:     334.353.8674
facsimile:      334.353.8400
Winfield.Sinclair@AlabamaAG.gov
Misty.Messick@AlabamaAG.gov

***Counsel for the State Defendants***